CONFORMED

1  STEPHEN R. MICK (SBN 131569)
   JULIA DE BEERS (SBN 233811)
2  smick@akingump.com
   jdebeers@akingump.com
3  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   Telephone:    310.229.1000
4  Facsimile:    310.229.1001
5  Attorneys for Defendants
   2929 Entertainment, L.P, Rysher Entertainment,
6  L.L.C., Qualia Capital LLC
7
8
9              UNITED STATES DISTRICT COURT
10            CENTRAL DISTRICT OF CALIFORNIA
11           WESTERN DIVISION – LOS ANGELES
12         **CV09-1906  MMM  (JCx)**
13  DON JOHNSON PRODUCTIONS,          Case No.
    INC.,
14                                     **NOTICE OF REMOVAL OF**
                    Plaintiffs,        **ACTION UNDER 28 U.S.C. §**
15                                     **1441(b)**
16      v.
17  RYSHER ENTERTAINMENT, INC.,       [Civil Cover Sheet; Certificate of
    QUALIA CAPITAL LLC; and 2929      Service of Notice to Adverse Parties;
18  ENTERTAINMENT, INC.,              Certification as to Interested Parties;
                                       and Notice of Related Cases filed
19                  Defendants.        concurrently herewith]
20                                    (Los Angeles County Superior Court
                                       Case No.: BC407796)
21
                                      Date action filed:  February 17, 2009
22
23
24
25
26
27
28

1

1   **PLEASE TAKE NOTICE** that defendants Rysher Entertainment, L.L.C.

2   (erroneously sued as Rysher Entertainment, Inc.), Qualia Capital LLC, and 2929

3   Entertainment, L.P. (erroneously sued as 2929 Entertainment, Inc.) (collectively

4   "Defendants") hereby remove to this Court the state court action described below:

5   1.   On February 17, 2009, plaintiff Don Johnson Productions, Inc, ("Plaintiff")

6   commenced the action in the Superior Court of the State of California, County of Los

7   Angeles, styled *Don Johnson Productions, Inc. v. Rysher Entertainment, Inc.*, case

8   number BC407796, against named defendants:  Rysher Entertainment, Inc., Qualia

9   Capital LLC, and 2929 Entertainment, Inc.   On February 17, 2009, Defendants were

10  served with a copy of Plaintiff's Complaint and Summons.   Attached hereto as Exhibit

11  "A" are true and correct copies of the Complaint and related documents.

12  2.   As explained below, the State Action is one that may be removed to this

13  Court by defendants pursuant to 28 U.S.C. § 1441(b), in that the Court has federal

14  subject matter jurisdiction over claims founded on a right arising under the laws of the

15  United States.

16

17  **I.   THIS REMOVAL NOTICE IS TIMELY**

18  3.   Pursuant to 28 U.S.C. § 1446, "[t]he Notice of removal of a civil action or

19  proceeding shall be filed within thirty days after the receipt by the defendant, through

20  service or otherwise, of a copy of the initial pleading…"

21  4.   As the state court complaint was filed on February 17, 2009, and served

22  that day, this Notice of Removal is timely because it is filed within thirty days.

23

24  **II.   THE COURT HAS FEDERAL SUBJECT MATTER JURISDICTION**

25  3.   Federal subject matter jurisdiction exists over a claim that is founded on a

26  right arising under the laws of the United States.   28 U.S.C. §§ 1441(b) and 1331.

27

28

Notice of Removal of Action under 28 U.S.C. § 1441(b)

1    4.   Plaintiff's fourth cause of action arises under the United States Copyright

2    Laws and presents a federal question pertaining to those laws, in that plaintiff alleges as

3    follows:

4              "Under copyright law, a co-owner of a copyright must account to

5              other co-owners for any profits earned from licensing or use of the

6              copyright.  As a 50% owner of the Nash Bridges copyright, DJP is

7              entitled to 50% of the profits as determined by Generally Accepted

8              Accounting Principles (GAAP) earned from exploiting the Series."

9    Complaint, ¶ 58.

10   5.   Plaintiff's cause of action therefore presents a claim founded on a right

11   arising entirely by virtue of the copyright law, and which presents a question as to the

12   existence and scope of its claimed co-ownership and the rights incident thereto, all of

13   which are based – by plaintiff's own admission and express allegation – on copyright

14   law.

15   **V.    VENUE**

16   6.   Venue is proper here because the Central District of California is the

17   judicial district embracing Los Angeles County wherein case no. BC407796 is pending.

18   See 28 U.S.C. §§ 84(c)(2), 1446(a).

19   **V.    OTHER REMOVAL PREREQUISITES HAVE BEEN SATISFIED**

20   7.   Defendants have sought no similar relief with respect to this matter.

21   8.   Written notice of the filing of this Notice of Removal will be given to the

22   adverse party as required by 28 U.S.C. § 1446(d).

23   9.   Pursuant to 28 U.S.C. § 1446(a), Exhibit "A" consists of all "process,

24   pleadings, and orders" served on defendants in the State Action.

25   10.   The allegations in this Notice of Removal are true and correct and this case

26   is within the jurisdiction of the United States District Court for the Central District of

27   California.

28

3

1    **WHEREFORE,** Defendants respectfully request that this matter be removed to

2    this Court from the Superior Court of the State of California for the County of Los

3    Angeles.

4    Dated:  March 19, 2009          AKIN GUMP STRAUSS HAUER & FELD LLP

5                                    STEPHEN R. MICK
                                     JULIA DE BEERS

6
                                     By_____
7                                            Stephen R. Mick
8                                        Attorneys for Defendants

---

4

# Exhibit A

# Exhibit A

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
RYSHER ENTERTAINMENT, INC., QUALIA CAPITAL LLC; and
2929 ENTERTAINMENT, INC.,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
DON JOHNSON PRODUCTIONS, INC.,

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

FEB 17 2009

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Los Angeles Superior Court<br>111 North Hill Street<br>Los Angeles, CA. 90012 | CASE NUMBER:<br>*(Número del Caso):*<br>BC407796 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert G. Krupka (S.B.N. 196625)
Kirkland & Ellis LLP
777 S. Figueroa Street
Los Angeles, CA 90017          213-680-8400

DATE:
*(Fecha)*                JOHN A. CLARKE, Clerk by _____ M. GARCIA, Deputy *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* 2929 ENTERTAINMENT, INC.

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☒ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

Exhibit A, Page 5



*from the*
### LOS ANGELES SUPERIOR COURT
**ADR DEPARTMENT**

If you have an unlimited civil case involving one of these subject matter areas:

- commercial
- employment
- medical malpractice
- legal malpractice

- real estate
- trade secrets
- unfair competition
- at judges' discretion

## *Your case may be eligible for the court's Neutral Evaluation (NE) program.*

♦ **NE can reduce litigation time and costs and promote settlement.**

♦ NE is an informal process that offers a non-binding evaluation by an experienced neutral lawyer with expertise in the subject matter of the case. After counsel present their claims and defenses, the neutral evaluates the case based on the law and the evidence.

♦ **NE is voluntary and confidential.**

♦ The benefits of NE include helping to clarify, narrow or eliminate issues, identify areas of agreement, offer case-planning suggestions and, if requested by the parties, assist in settlement.

♦ **The first three (3) hours of the NE session are free of charge.**

For additional NE information, visit the Court's web site at www.lasuperiorcourt.org/adr

REV. 06/27/07

Exhibit A, Page 6

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## ALTERNATIVE DISPUTE RESOLUTION INFORMATION PACKAGE
[CRC 3.221 Information about Alternative Dispute Resolution]

The plaintiff shall serve a copy of this Information Package on each defendant along with the complaint (Civil only).

**What Is ADR:**
Alternative Dispute Resolution (ADR) is the term used to describe all the other options available for settling a dispute which once had to be settled in court. ADR processes, such as arbitration, mediation, neutral evaluation (NE), and settlement conferences, are less formal than a court process and provide opportunities for parties to reach an agreement using a problem-solving approach.

There are many different kinds of ADR. All of them utilize a "neutral", an impartial person, to decide the case or help the parties reach an agreement.

**Mediation:**
In mediation, a neutral person called a "mediator" helps the parties try to reach a mutually acceptable resolution of the dispute. The mediator does not decide the dispute but helps the parties communicate so they can try to settle the dispute themselves. Mediation leaves control of the outcome with the parties.

**Cases for Which Mediation May Be Appropriate**
Mediation may be particularly useful when parties have a dispute between or among family members, neighbors, or business partners. Mediation is also effective when emotions are getting in the way of resolution. An effective mediator can hear the parties out and help them communicate with each other in an effective and nondestructive manner.

**Cases for Which Mediation May Not Be Appropriate**
Mediation may not be effective if one of the parties is unwilling to cooperate or compromise. Mediation also may not be effective if one of the parties has a significant advantage in power over the other. Therefore, it may not be a good choice if the parties have a history of abuse or victimization.

**Arbitration:**
In arbitration, a neutral person called an "arbitrator" hears arguments and evidence from each side and then decides the outcome of the dispute. Arbitration is less formal than a trial, and the rules of evidence are often relaxed. Arbitration may be either "binding" or "nonbinding." *Binding arbitration* means that the parties waive their right to a trial and agree to accept the arbitrator's decision as final. *Nonbinding arbitration* means that the parties are free to request a trial if they do not accept the arbitrator's decision.

**Cases for Which Arbitration May Be Appropriate**
Arbitration is best for cases where the parties want another person to decide the outcome of their dispute for them but would like to avoid the formality, time, and expense of a trial. It may also be appropriate for complex matters where the parties want a decision-maker who has training or experience in the subject matter of the dispute.

**Cases for Which Arbitration May Not Be Appropriate**
If parties want to retain control over how their dispute is resolved, arbitration, particularly binding arbitration, is not appropriate. In binding arbitration, the parties generally cannot appeal the arbitrator's award, even if it is not supported by the evidence or the law. Even in nonbinding arbitration, if a party requests a trial and does not receive a more favorable result at trial than in arbitration, there may be penalties.

**Neutral Evaluation:**
In neutral evaluation, each party gets a chance to present the case to a neutral person called an "evaluator." The evaluator then gives an opinion on the strengths and weaknesses of each party's evidence and arguments and about how the dispute could be resolved. The evaluator is often an expert in the subject matter of the dispute. Although the evaluator's opinion is not binding, the parties typically use it as a basis for trying to negotiate a resolution of the dispute.

**Cases for Which Neutral Evaluation May Be Appropriate**
Neutral evaluation may be most appropriate in cases in which there are technical issues that require special expertise to resolve or the only significant issue in the case is the amount of damages.

**Cases for Which Neutral Evaluation May Not Be Appropriate**
Neutral evaluation may not be appropriate when there are significant personal or emotional barriers to resolving the dispute.

**Settlement Conferences:**
Settlement conferences may be either mandatory or voluntary. In both types of settlement conferences, the parties and their attorneys meet with a judge or a neutral person called a "settlement officer" to discuss possible settlement of their dispute. The judge or settlement officer does not make a decision in the case but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Settlement conferences are appropriate in any case where settlement is an option. Mandatory settlement conferences are often held close to the date a case is set for trial.

Exhibit A, Page 7

## LOS ANGELES SUPERIOR COURT ADR PROGRAMS

**CIVIL:**

- **Civil Action Mediation** (Governed by Code of Civil Procedure (CCP) sections 1775-1775.15, California Rules of Court, rules 3.850-3.868 and 3.870-3.878, Evidence Code sections 1115-1128, and Los Angeles Superior Court Rules, chapter 12.)
- **Retired Judge Settlement Conference**
- **Neutral Evaluation** (Governed by Los Angeles Superior Court Rules, chapter 12.)
- **Judicial Arbitration** (Governed by Code of Civil Procedure sections 1141.10-1141.31, California Rules of Court, rules 3.810-3.830, and Los Angeles Superior Court Rules, chapter 12.)
- **Eminent Domain Mediation** (Governed by Code of Civil Procedure section 1250.420.)
- **Civil Harassment Mediation**
- **Small Claims Mediation**

**FAMILY LAW (non-custody):**

- **Mediation**
- **Forensic Certified Public Accountant (CPA) Settlement Conference**
- **Settlement Conference**
- **Nonbinding Arbitration** (Governed by Family Code section 2554.)

**PROBATE:**

- **Mediation**
- **Settlement Conference**

### NEUTRAL SELECTION

Parties may select a mediator, neutral evaluator, or arbitrator from the Court Party Pay Panel or may hire someone privately, at their discretion. If the parties utilize the Pro Bono Mediation or Arbitration Panel, the parties will be assigned on a random basis the name of one neutral who meets the case criteria entered on the court's website.

### COURT ADR PANELS

**Party Pay Panel** The Party Pay Panel consists of mediators, neutral evaluators, and arbitrators who have achieved a specified level of experience in court-connected cases. The parties (collectively) may be charged $150.00 per hour for the first three hours of hearing time. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing.

**Pro Bono Panel** The Pro Bono Panel consists of trained mediators, neutral evaluators, and arbitrators who have not yet gained the experience to qualify for the Party Pay Panel, as well as experienced neutrals who make themselves available pro bono as a way of supporting the judicial system. It is the policy of the Court that all pro bono volunteer mediators, neutral evaluators, and arbitrators provide three hours hearing time per case. Thereafter, the parties may be charged for additional hearing time on an hourly basis at rates established by the neutral if the parties consent in writing.

**Private Neutral** The market rate for private neutrals can range from $300-$1,000 per hour.

### ADR ASSISTANCE

For assistance regarding ADR, please contact the ADR clerk at the courthouse in which your case was filed.

| Antonovich | 42011 4th St. West | None | Lancaster, CA 93534 | (661)974-7275 | (661)974-7060 |
|---|---|---|---|---|---|
| Chatsworth | 9425 Penfield Ave. | 1200 | Chatsworth, CA 91311 | (818)576-8565 | (818)576-8667 |
| Compton | 200 W. Compton Blvd. | 1002 | Compton, CA 90220 | (310)603-3072 | (310)223-0337 |
| Glendale | 600 E. Broadway | 273 | Glendale, CA 91206 | (818)500-3160 | (818)548-5470 |
| Long Beach | 415 W. Ocean Blvd. | 316 | Long Beach, CA 90802 | (562)491-6272 | (562)437-3802 |
| Norwalk | 12720 Norwalk Blvd. | 308 | Norwalk, CA 90650 | (562)807-7243 | (562)482-9019 |
| Pasadena | 300 E. Walnut St. | 109 | Pasadena, CA 91101 | (626)356-5685 | (626)666-1774 |
| Pomona | 400 Civic Center Plaza | 106 | Pomona, CA 91766 | (909)620-3183 | (909)629-6283 |
| San Pedro | 505 S. Centre | 209 | San Pedro, CA 90731 | (310)519-6151 | (310)514-6314 |
| Santa Monica | 1725 Main St. | 203 | Santa Monica, CA 90401 | (310)260-1829 | (310)319-6130 |
| Stanley Mosk | 111 N. Hill St. | 113 | Los Angeles, CA 90012 | (213)974-5425 | (213)633-5115 |
| Torrance | 825 Maple Ave. | 100 | Torrance, CA 90503 | (310)222-1701 | (310)782-7326 |
| Van Nuys | 6230 Sylmar Ave. | 418 | Van Nuys, CA 91401 | (818)374-2337 | (818)902-2440 |

For additional information, visit the Court ADR web application at www.lasuperiorcourt.org (click on ADR).

Partially Funded by the Los Angeles County Dispute Resolution Program

LAADR 005 (Rev. 08/08)
LASC Approval 10-03

Page 2 of 2

Exhibit A, Page 8

# LOS ANGELES COUNTY
# DISPUTE RESOLUTION PROGRAMS ACT (DRPA) CONTRACTORS

The following organizations provide mediation services under contract with the Los Angeles County Department of Community & Senior Services. Services are provided to parties in any civil case filed in the Los Angeles County Superior Court. Services are not provided under this program to family, probate, traffic, criminal, appellate, mental health, unlawful detainer/eviction or juvenile court cases.

### Asian-Pacific American Dispute Resolution Center
(213) 250-8190
(Spanish & Asian languages capability)

### California Academy of Mediation Professionals
(818) 377-7250

### Center for Conflict Resolution
(818) 380-1840

### Inland Valleys Justice Center
(909) 397-5780
(Spanish language capability)

### Office of the Los Angeles City Attorney Dispute Resolution Program
(213) 485-8324
(Spanish language capability)

### Los Angeles County Bar Association Dispute Resolution Services
toll free number 1-877-4Resolve (737-6583) or (213) 896-6533
(Spanish language capability)

### Los Angeles County Department of Consumer Affairs
(213) 974-0825
(Spanish language capability)

### The Loyola Law School Center for Conflict Resolution
(213) 736-1145
(Spanish language capability)

### Martin Luther King Legacy Association Dispute Resolution Center
(323) 290-4132
(Spanish language capability)

### City of Norwalk
(562) 929-5603

---

**DRPA Contractors do not provide legal advice or assistance, including help with responding to summonses. Accessing these services does not negate any responsibility you have to respond to a summons or appear at any set court date. See the reverse side of this sheet for information on the mediation process and obtaining legal advice.**

---

## THIS IS A TWO-SIDED DOCUMENT.

### What is the goal of mediation?

The goal is to assist the parties in reaching a mutually acceptable agreement or understanding on some or all of the issues. The parties jointly become the primary decision maker in how to resolve the issues as opposed to the traditional judge and/or jury system.

### Do I need an attorney for this?

While it is recommended to have an attorney and/or receive legal advice before the mediation starts, you are not required to have representation. If you do have an attorney, they may participate in the mediation with you.

### How long does it take?

Face-to-face mediations generally last one to three hours. Telephone conciliations, in which the parties do not meet face to face, vary from a few days to several weeks. Much depends on the number of parties involved and the complexities of the issues. When the mediation takes place depends on parties scheduling availability.

| A Mediator helps parties... | A Mediator does not... |
|---|---|
| ♦ Have productive discussions<br>♦ Avoid or break impasses<br>♦ Defuse controversy<br>♦ Generate options that have potential for mutual gain<br>♦ Better understand each other's concerns and goals<br>♦ Focus on their interests rather than their positions | ♦ Provide advice or opinions<br>♦ Offer legal information<br>♦ Make decisions for parties<br>♦ Represent or advocate for either side<br>♦ Judge or evaluate anyone or anything<br>♦ Conduct research<br>♦ "Take Sides" |

### What does it cost?

The first three hours of any mediation are free. Thereafter, charges are based on income or revenue. All fees are waived for low-income individuals.

### Legal Advice/Information

If you want to retain an attorney, a list of state certified referral services is at courtinfo.ca.gov which also has an on-line self help legal center.

**Self-Help Legal Access Centers** are at the Inglewood, Palmdale, Pomona, and Van Nuys courthouses. nls-la.org and lafla.org

### What is the difference between the contractors listed and the Superior Court ADR Office?

The services offered by the contractors listed may be accessed immediately. Those offered by the Superior Court ADR Office, also a DRPA contractor, may not be accessed by parties until a court appearance, or at the directive of the judge assigned to the case.

**Court Personnel** can answer non-legal questions (forms, fees, fee waivers). lasuperiorcourt.org

**Low-income individuals** may qualify for help from non-profit legal organizations. Court Personnel and DRPA contractors have such listings.

---

### Dispute Resolution Programs Act (DRPA) Grants Administration Office
### (213) 738-2621
(The DRP Office is not a Superior Court Office. Consult your phone directory to locate the number of the Court Office on your summons.)

## THIS IS A TWO-SIDED DOCUMENT.

Exhibit A, Page 10

| NAME, ADDRESS, AND TELEPHONE NUMBER OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION TO PARTICIPATE IN ALTERNATIVE DISPUTE RESOLUTION (ADR)** | CASE NUMBER: |
|---|---|

The undersigned parties stipulate to participate in an Alternative Dispute Resolution (ADR) process in the above-entitled action, as follows:

☐ Mediation

☐ Non-Binding Arbitration

☐ Binding Arbitration

☐ Early Neutral Evaluation

☐ Settlement Conference

☐ Other ADR Process *(describe):* _____

Dated: _____

| Name of Stipulating Party<br>☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| Name of Stipulating Party<br>☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Name of Stipulating Party<br>☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
| Name of Stipulating Party<br>☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |

☐ **Additional signature(s) on reverse**

LAADR 001 10-04
LASC Approved
(Rev. 01-07)

**STIPULATION TO PARTICIPATE IN ALTERNATIVE DISPUTE RESOLUTION (ADR)**

Cal. Rules of Court, rule 3.221
Page 1 of 2

Exhibit A, Page 11

| Short Title | Case Number |
| --- | --- |
| | |

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

Name of Stipulating Party
☐ Plaintiff ☐ Defendant ☐ Cross-defendant

Name of Party or Attorney Executing Stipulation

Signature of Party or Attorney

LAADR 001 10-04
LASC Approved
(Rev. 01-07)

**STIPULATION TO PARTICIPATE IN
ALTERNATIVE DISPUTE RESOLUTION (ADR)**

Cal. Rules of Court, rule 3.221
Page 2 of 2

Exhibit A, Page 12

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
NOTICE OF CASE ASSIGNMENT - UNLIMITED CIVIL CASE
Case Number

BC407796

Your case is assigned for all purposes to the judicial officer indicated below (Local Rule 7.3(c)). There is additional information on the reverse side of this form.

THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| ASSIGNED JUDGE | DEPT | ROOM | ASSIGNED JUDGE | DEPT | ROOM | |
|---|---|---|---|---|---|---|
| Hon. Elihu M. Berle | 1 | 534 | Hon. Holly E. Kendig | 42 | 416 | |
| Hon. J. Stephen Czuleger | 3 | 224 | Hon. Mel Red Recana | 45 | 529 | |
| Hon. Luis A. Lavin | 13 | 630 | Hon. Aurelio Munoz | 47 | 507 | |
| Hon. Terry A. Green | 14 | 300 | Hon. Elizabeth Allen White | 48 | 506 | |
| Hon. Richard Fruin | 15 | 307 | Hon. Conrad Aragon | 49 | 509 | |
| Hon. Rita Miller | 16 | 306 | Hon. John Shepard Wiley Jr. | 50 | 508 | |
| Hon. Mary Thornton House | 17 | 309 | Hon. Abraham Khan | 51 | 511 | |
| Hon. Helen I. Bendix | 18 | 308 | Hon. Susan Bryant-Deason | 52 | 510 | |
| Hon. Judith C. Chirlin | 19 | 311 | Hon. John P. Shook | 53 | 513 | |
| Hon. Kevin C. Brazile | 20 | 310 | Hon. Ernest M. Hiroshige | 54 | 512 | |
| Hon. Zaven V. Sinanian | 23 | 315 | Hon. Malcolm H. Mackey | 55 | 515 | |
| Hon. Robert L. Hess | 24 | 314 | Hon. Jane L. Johnson | 56 | 514 | |
| Hon. Mary Ann Murphy | 25 | 317 | Hon. Ralph W. Dau | 57 | 517 | |
| Hon. James R. Dunn | 26 | 316 | Hon. Rolf M. Treu | 58 | 516 | |
| Hon. Yvette M. Palazuelos | 28 | 318 | Hon. David L. Minning | 61 | 632 | |
| Hon. John A. Kronstadt | 30 | 400 | Hon. Michael L. Stern | 62 | 600 | |
| Hon. Alan S. Rosenfield | 31 | 407 | Hon. Kenneth R. Freeman | 64 | 601 | |
| Hon. Mary H. Strobel | 32 | 406 | Hon. Mark Mooney | 68 | 617 | |
| Hon. Charles F. Palmer | 33 | 409 | Hon. Edward A. Ferns | 69 | 621 | |
| Hon. Amy D. Hogue | 34 | 408 | Hon. Soussan G. Bruguera | 71 | 729 | |
| Hon. Gregory Alarcon | 36 | 410 | Hon. Ruth Ann Kwan | 72 | 731 | |
| Hon. Joanne O'Donnell | 37 | 413 | Hon. Teresa Sanchez-Gordon | 74 | 735 | |
| Hon. Maureen Duffy-Lewis | 38 | 412 | Hon. William F. Fahey | 78 | 730 | |
| Hon. Michael C. Solner | 39 | 415 | Hon. Carl J. West* | 311 | CCW | |
| Hon. Ann I. Jones | 40 | 414 | Other | | | |
| Hon. Ronald M. Sohigian | 41 | 417 | | | | |

*Class Actions
All class actions are initially assigned to Judge Carl J. West in Department 311 of the Central Civil West Courthouse (600 S. Commonwealth Ave., Los Angeles 90005). This assignment is for pretrial purposes and for the purpose of assessing whether or not the case is complex within the meaning of California Rules of Court, rule 3.400. Depending on the outcome of that assessment, the class action case may be reassigned to one of the judges of the Complex Litigation Program or reassigned randomly to a court in the Central District.

Given to the Plaintiff/Cross-Complainant/Attorney of Record on _____    JOHN A. CLARKE, Executive Officer/Clerk
                                                                By _____, Deputy Clerk

LACIV CCH 190 (Rev. 01/09)                    NOTICE OF CASE ASSIGNMENT –                              Page 1 of 2
LASC Approved 05-06                             UNLIMITED CIVIL CASE

Exhibit A, Page 13

# INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the Chapter Seven Rules, as applicable in the Central District, are summarized for your assistance.

## APPLICATION

The Chapter Seven Rules were effective January 1, 1994. They apply to all general civil cases.

## PRIORITY OVER OTHER RULES

The Chapter Seven Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

## CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

## TIME STANDARDS

Cases assigned to the Individual Calendaring Court will be subject to processing under the following time standards:

**COMPLAINTS:** All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days of filing.

**CROSS-COMPLAINTS:** Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

A Status Conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

## FINAL STATUS CONFERENCE

The Court will require the parties at a status conference not more than 10 days before the trial to have timely filed and served all motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested jury instructions, and special jury instructions and special jury verdicts. These matters may be heard and resolved at this conference. At least 5 days before this conference, counsel must also have exchanged lists of exhibits and witnesses and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Eight of the Los Angeles Superior Court Rules.

## SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Seven Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Seven Rules. Such sanctions may be on a party or if appropriate on counsel for the party.

**This is not a complete delineation of the Chapter Seven Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is absolutely imperative.**

Exhibit A, Page 14

Robert G. Krupka (S.B.N 196625)
Mark C. Holscher (S.B.N. 139582)
R.C. Harlan (S.B.N. 234279)
KIRKLAND & ELLIS LLP
777 South Figueroa Street
Los Angeles, California 90017
Telephone:    (213) 680-8400
Facsimile:    (213) 680-8500

Attorneys for Plaintiff Don Johnson Productions, Inc.

**FILED**
LOS ANGELES SUPERIOR COURT

FEB 17 2009

JOHN A. CLARKE, CLERK
BY MARY GARCIA, DEPUTY

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| DON JOHNSON PRODUCTIONS, INC., | CASE NO.  **BC407796** |
| Plaintiff, | **COMPLAINT FOR (1) BREACH OF CONTRACT; (2) CONVERSION; (3) UNJUST ENRICHMENT; (4) ACTION FOR AN ACCOUNTING; AND (5) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| vs. | |
| RYSHER ENTERTAINMENT, INC., QUALIA CAPITAL LLC; and 2929 ENTERTAINMENT, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

**COMPLAINT**

ORIGINAL

## NATURE OF ACTION

1.     Don Johnson Productions is owed tens of millions of dollars from the defendants for its 50% share of the profits from the copyright Don Johnson Productions owns in the hit television series Nash Bridges (the Series), which Don Johnson co-conceived, starred in, and produced. Nash Bridges was one of the most successful television shows of its era, airing Friday nights on CBS Network Television for six years as the number-one-rated live-action series on Friday nights. The Series earned over $300 million in revenue and over $150 million from its syndication in the U.S. and throughout the world. As the star in the Series, Don Johnson, through Don Johnson Productions, negotiated for and obtained half the copyright covering the Series. As co-owner of the copyright, Don Johnson Productions is entitled to 50% of the profits from the copyright. However, Don Johnson Productions has not received any of its 50% share of the profits from its copyright interest in the Series. Despite being co-owner of the copyright, Don Johnson Productions has received no money from any of the revenue associated with syndication of the Series.

2.     In 1994, Don Johnson, through his company Don Johnson Productions, Inc. (DJP), entered into an agreement (the "Term Agreement") with Rysher Entertainment, Inc. (Rysher), governing the production of Nash Bridges. Because of Don Johnson's unique leverage after his success with the just-finished Miami Vice series, DJP was able to negotiate for and obtain under the Term Agreement ownership of half of the copyright to Nash Bridges, which would be split evenly between DJP and Rysher. Even with Don Johnson's great leverage, DJP's half ownership of the copyright would only vest if Nash Bridges ran for more than 66 episodes, thus creating additional revenues from syndication.

3.     In 1996, DJP and Rysher began producing episodes of Nash Bridges. The television series premiered on CBS Television on March 29, 1996. Nash Bridges ran for well past 66 episodes, and as a result, DJP's half ownership interest vested. After 122 episodes, the final episode of Nash Bridges aired on CBS Television on May 4, 2001.

4.     In addition to its first run on CBS, Nash Bridges entered syndication in 1999, airing on the USA Television Network. Nash Bridges is presently syndicated on WGN America, airing twice daily across the country. Additionally, upon information and belief, Nash Bridges is syndicated in

Exhibit A, Page 16

1  more than 50 countries, including on MBC Action in the Middle East, Showcase Action in Canada,

2  and FX (UK) in the United Kingdom.

3      5.   Despite the Term Agreement's express language, neither Don Johnson nor his

4  companies have ever received any money as a result of DJP's 50% ownership of the Nash Bridges

5  copyright.

6      6.   This action seeks damages, both actual and exemplary, against 2929 Entertainment,

7  Qualia Capital, and Rysher Entertainment caused by Defendants' unlawful failure to remit to DJP its

8  50% share of their profits realized from exploiting the Nash Bridges copyright through syndication.

9  2929 Entertainment and Qualia Capital have taken in over $80 million in revenues from the

10  syndication alone in the last six years.

## PARTIES, JURISDICTION AND VENUE

12      7.   Plaintiff Don Johnson Productions, Inc. is a corporation wholly owned by Don

13  Johnson, and is based in Los Angeles, California, located in Los Angeles County, California, and is

14  qualified to do business in California.

15      8.   Defendant 2929 Entertainment, Inc., is a Delaware corporation that conducts business

16  in California. This Court has jurisdiction over 2929 Entertainment, Inc. because it maintains an

17  office in Santa Monica, California, located in Los Angeles County, availing itself of the protections

18  and benefits of the laws of this state.

19      9.   Defendant Qualia Capital LLC, is a New York corporation that conducts business in

20  California. This Court has jurisdiction over Qualia Capital LLC because it maintains an office in

21  Pacific Palisades, California located in Los Angeles County, availing itself of the protections and

22  benefits of the laws of this state.

23      10.   Defendant Rysher Entertainment, Inc. was a wholly owned subsidiary of 2929

24  Entertainment, Inc. until 2006, during which it conducted business and maintained an office in Los

25  Angeles County. After 2006, Rysher Entertainment, Inc. was purchased by Qualia Capital LLC, and

26  became a wholly-owned subsidiary of Qualia Capital LLC, conducting business in Los Angeles, and

27  availing itself of the protections and benefits of the laws of this state.

28      11.   Additionally, the witnesses and documents relevant to this action reside in Los Angeles

Exhibit A, Page 17

1    County, California.

2        12.   Venue is proper in this Court, as Defendants 2929 Entertainment, Qualia Capital, and

3    Rysher Entertainment maintain offices in Los Angeles County and no other California court has a

4    greater connection to the parties and the events.

5                              FACTUAL BACKGROUND

6    I.   DEVELOPMENT AND PRODUCTION OF NASH BRIDGES

7        13.   In the early 1990's, Don Johnson was one of the most popular actors in this country

8    and in high demand. He had just finished starring in the highly successful television series Miami

9    Vice, in which he played the lead role as Detective Sonny Crockett. Johnson won a Golden Globe

10   award and was nominated for an Emmy for his lead performance in Miami Vice. The immense

11   popularity of Miami Vice made Johnson one of the most bankable television stars in the early 1990s.

12   After Miami Vice ended, Johnson began negotiating with the major television networks to star in a

13   new live-action television series.

14       14.   On November 1, 1994, CBS Television and DJP entered into a series commitment

15   agreement. Although Johnson had not finalized the concept of this show, CBS agreed to air 22

16   episodes of a sixty-minute prime-time live-action television series starring Don Johnson. This series

17   would become Nash Bridges.

18       15.   After receiving the series commitment from CBS, Johnson began discussions with

19   production companies to develop and produce the Series. Several production companies were eager

20   to work with Johnson, including Rysher Entertainment, Inc. The competition among production

21   companies to sign with Johnson allowed him to extract virtually unprecedented terms during the

22   negotiations. Indeed, Johnson chose to partner with Rysher over other production companies

23   precisely because it offered the most lucrative deal, one that included a feature film commitment,

24   exclusive control of interactive devices related to Nash Bridges, and an unprecedented 50%

25   ownership of the Series copyright if the Series was successful enough to be bought for 66 episodes

26   and to be eligible for potentially lucrative syndication revenue. "Talent" or actors in television series

27   very rarely, if ever, get an ownership interest in the copyright of the series. On December 7, 1994,

28   Rysher and DJP entered into a written agreement governing the production of Nash Bridges — the

Exhibit A, Page 18

1 | Term Agreement (Exh. A).

2 |     16.    During the course of producing the Series, Rysher and DJP amended the Term

3 | Agreement in writing three times (in 1997, 1998, and 1999). Each Amendment expressly ratified

4 | and reaffirmed the Term Agreement. The third and final amendment was signed by both Rysher and

5 | DJP.

6 |     17.    The Term Agreement was a groundbreaking contract that defied industry norms. At

7 | the time it was created it was unheard of for talent to receive a copyright interest. The Term

8 | Agreement granted DJP co-ownership of the Series' copyright, but only after Nash Bridges had

9 | completed 66 episodes and became eligible for syndication. This syndication-trigger in the Term

10 | Agreement incentivized DJP to produce a successful series ensuring greater revenue in the future

11 | from syndication. As discussed in more detail below, the unique provisions of the Term Agreement

12 | guaranteed DJP two separate streams of income: one through Don Johnson as an actor and producer

13 | and the other as a copyright co-owner.

14 |     18.    At the same time that he was negotiating the 1994 agreement with Rysher, Johnson

15 | was actively finalizing a show concept. This concept eventually became Nash Bridges.

16 |     19.    Before production began, Rysher created Nash Bridges Productions, which ultimately

17 | became the corporate vehicle through which the Series was produced and financed with capital

18 | provided by Rysher's then parent company, Cox Communications.

19 |     20.    Production of Nash Bridges began in 1996, with the first episode airing on CBS on

20 | March 29, 1996. Don Johnson and his staff, through DJP, produced Nash Bridges, with Rysher and

21 | Cox providing financing.

22 |     21.    Ultimately, 122 episodes of Nash Bridges were produced and aired over 6 seasons on

23 | CBS, becoming the number-one-watched show on Friday prime-time television. CBS aired the final

24 | episode of Nash Bridges on May 4, 2001.

25 |     22.    Rysher was contractually obligated to fund the production of the Series. In fact,

26 | Rysher protected itself in Section II-5 of the Term Agreement by requiring DJP to seek Rysher's

27 | approval for all production expenses over the "Budget Cap" of $1.5 million per episode. This

28 | Budget Cap was subsequently increased through later amendments of the Term Agreement,

1    ultimately reaching the agreed upon sum of $2.475 million in the August 2, 1999 Third Amendment.

2    Throughout the course of producing the Series, pursuant to the Term Agreement and the

3    amendments, Rysher still had to approve of, and in fact did approve of, expenditures over the then-

4    existing Budget Cap.

5    II.    SALE AND BREAKUP OF RYSHER ENTERTAINMENT

6         23.   In 1988, Cox created Rysher Entertainment. Rysher's library catalog includes

7    television and feature film classics such as Hogan's Heroes, Ben Casey, and Walking Tall, as well as

8    more recent programs including Nash Bridges, Highlander: The Series, The Opposite of Sex,

9    Kingpin and Big Night. Rysher also distributes internationally through CBS Paramount several of

10   HBO's award winning titles including Deadwood, Oz, and Sex and the City.

11        24.   In 2001, 2929 Entertainment, Inc., owned by Mark Cuban, purchased Rysher from

12   Cox. In order to complete the sale, Cox forgave the debt Rysher owed to Cox for the financing of

13   Nash Bridges. Cox wrote down the production costs of Nash Bridges, and took a loss on Rysher's

14   liability to Cox for the deficit financing of the production of Nash Bridges. Accordingly, Rysher and

15   2929 Entertainment did not pay Cox back for the direct production costs incurred to produce the

16   Series. Since that sale and Cox's write-down, Rysher, 2929 Entertainment, and now Qualia, have

17   been profiting from the revenue received from Nash Bridges, while reporting to DJP that the series

18   was still $150 million in the red.

19        25.   After its sale to 2929 Entertainment, Rysher was a mere shell corporation with no

20   employees or offices. Rysher was a holding corporation for its extensive catalog which 2929

21   Entertainment exploited for its own gain. During its ownership of Rysher, 2929 Entertainment's

22   employees operated Rysher, had the same offices, and directed any revenues received by Rysher to

23   2929 Entertainment. Rysher was the alter ego of 2929 Entertainment.

24        26.   In 2006, 2929 Entertainment sold Rysher to Qualia Capital, the present owner. Once

25   again, Rysher was operated merely as a holding corporation for its extensive catalog, which Qualia

26   Capital exploited for its own gain. Rysher did not have any employees, rather Qualia Capital's

27   employees operated Rysher, maintained the same offices, and directed any revenues received by

28   Rysher to Qualia Capital. Rysher was the alter ego of Qualia Capital. Recently, Qualia Capital

Exhibit A, Page 20

1    dissolved Rysher as a separate corporation, and merged it and its catalog into Qualia Library

2    Companies. However, Qualia continues to distribute Rysher's entertainment catalog under the

3    Rysher name and logo.

4         27.   It is believed that Nash Bridges has earned over $100 million since Cox sold Rysher to

5    2929 Entertainment in 2001 and forgave all of Rysher's debt. This revenue has effectively been

6    pure profit to Rysher, 2929 Entertainment, and Qualia Capital. Yet DJP has not received any portion

7    of this profit, despite being a 50% co-owner of the Nash Bridges copyright.

8    **III.    SYNDICATION OF NASH BRIDGES**

9         28.   After Paramount took over the management of Rysher in 1999, Rysher agreed to

10   syndicate Nash Bridges on USA Networks. It is believed that Nash Bridges realized approximately

11   $62 million in revenue over the course of the USA syndication deal. Neither Don Johnson, nor any

12   of his companies, were a party to the USA syndication agreement despite DJP being a 50% co-

13   owner of the copyright. It is also believed that USA Networks was never informed that DJP owned

14   50% of the copyright to the Series. In 2001 after producing 122 episodes, Rysher decided to stop

15   producing Nash Bridges.

16        29.   On information and belief, Nash Bridges is presently syndicated domestically on WGN

17   Superstation (now known as WGN America), airing twice a day. Once again, neither Don Johnson,

18   nor any of his companies, were a party to this syndication agreement, despite DJP owning 50% of

19   the copyright.

20        30.   On information and belief, Nash Bridges is currently syndicated in over 50 countries.

21   It is believed that none of the parties who have signed syndication agreements with Rysher and

22   Paramount Television have been informed that DJP owns 50% of the copyright to the series.

23   **IV.    TERM AGREEMENT SECTION II-12 — COPYRIGHT OWNERSHIP.**

24        31.   Under Section II-12 of the Term Agreement, DJP owns 50% of the copyright to Nash

25   Bridges. As a copyright co-owner, DJP is entitled to 50% of Rysher's profits from exploitation of

26   the copyright.

27        32.   DJP fully performed under the Term Agreement by producing, causing Don Johnson to

28   star in, and delivering to Rysher 122 completed episodes of Nash Bridges for distribution. In fact,

1   DJP's and Don Johnson's efforts made Nash Bridges the number-one-rated television show on

2   Friday nights.

3        33.   Defendants have failed to remit to DJP any profit earned from the exploitation of the

4   Nash Bridges series, let alone the 50% it is entitled to, in violation of its rights as a co-owner of the

5   series copyright.

6        34.   Section II-12 also required Rysher to "document the provisions of [Section II-12] so

7   that DJP's copyright interest will be legally valid pursuant to the requirements of any applicable

8   copyright laws." (See Section II-12, Exh. A). On information and belief, Rysher breached the Term

9   Agreement by failing and refusing to register DJP's 50% ownership of the Series copyright with the

10  U.S. Copyright Office, nor has DJP's rights been formally documented in any manner other than the

11  express terms of the Term Agreement.

12       35.   On information and belief, Rysher has also withheld from the parties with whom it has

13  contracted with to syndicate Nash Bridges that DJP is a 50% co-owner of the Series copyright.

14  **V.    TERM AGREEMENT SECTION II-4 — CONTINGENT COMPENSATION**

15       36.   In addition to providing DJP 50% ownership in the Series copyright, the Term

16  Agreement, under Section II-4, also guaranteed DJP 50% of all gross receipts (AGR), which is

17  defined as all gross receipts from all sources received by Rysher or any affiliated entity after the

18  deduction of (i) a 15% distribution fee to Rysher, (ii) distribution costs, (iii) direct production costs,

19  and (iv) interest on the net deficited portion of the direct production costs. Section II-4 of the Term

20  Agreement is the typical "Hollywood Accounting" provision designed to make it impossible (or at

21  least seem so) for a show to ever turn a "net profit," thus relieving the studio's obligation to share

22  any profits with the talent responsible for producing the show. By including onerous phantom

23  interest, overhead, and production fees, this "net profits" definition is skewed to make it virtually

24  impossible for an actor to be entitled to net profit. As is typical of these so-called "Hollywood

25  Accounting" provisions, Section II-4 has been used successfully by Rysher and its successors to

26  preclude Nash Bridges from showing anything but a net loss under its terms. The last accounting

27  received by DJP from Rysher showed that while Nash Bridges has brought in over $316 million in

28  gross revenues, there is still allegedly a $150 million deficit under Section II-4.

8<br>COMPLAINT

37.   Section II-4 does not reference nor does it apply to Section II-12 discussed above. Section II-4 in no way limits DJP's rights as a copyright co-owner under contract or copyright law. Rather, section II-4 merely grants DJP 50% of AGR as that term is defined in the Term Agreement in addition to his rights as a co-owner of the copyright.

## VI.   TERM AGREEMENT SECTION IV-1 — EXCLUSIVE CONTROL OF INTERACTIVE DEVICES.

38.   Section IV-1 of the Term Agreement grants DJP all rights to exploit the Series through "interactive devices," which include CD-ROM's and other discs or computer-assisted devices.

39.   Despite this grant of an exclusive right to exploit the Series through interactive devices, Rysher has repeatedly denied DJP access to the Nash Bridges masters stymieing DJP's efforts to exercise these rights.

40.   Since at least 2006, Don Johnson has had offers to exploit Nash Bridges through online and mobile interactive devices.  Don Johnson has made this clear to executives at Rysher, 2929 Entertainment, and Qualia Capital through a series of emails and meetings from 2006 to 2007.  Don Johnson even offered to have a representative from DIVX, an Internet company eager to work with Johnson to exploit the Series online, meet face-to-face with defendants.  Yet defendants continually refused to cooperate with Johnson in his efforts to exploit the copyright through interactive devices.

## VII.   TOLLING AGREEMENT

41.   On May 16, 2002, Rysher and DJP entered into a letter agreement tolling the statute of limitations (and the doctrine of laches) for "any action relating to the series 'Nash Bridges' against Rysher Entertainment . . . ."  (See Exh. B).

42.   The letter expressly states that the tolling period began on May 15, 2002.

43.   The letter states that the tolling agreement can be rescinded by the other party upon 30 days notice to the other side.  To date, neither party has given notice of its intent to rescind this agreement.

### FIRST CAUSE OF ACTION — BREACH OF CONTRACT

### AGAINST ALL DEFENDANTS

44.   Plaintiff incorporates by reference all of the allegations set forth in Paragraphs 1

through 43 of this complaint as though fully set forth herein.

45. DJP fully performed under the Term Agreement by producing and delivering 122 episodes of Nash Bridges to Rysher for distribution to CBS Television.

46. Section II-12 makes DJP a 50% owner in the Series copyright. Defendants breached the Term Agreement by failing to "document the provisions of [Section II-12] so that DJP's copyright interest will be legally valid pursuant to the requirements of any applicable copyright laws."

47. As a copyright co-owner, DJP is entitled to 50% of all profits earned from the exploitation of Nash Bridges. Defendants breached the Term Agreement by failing to remit to DJP 50% of the profits realized from exploiting Nash Bridges.

48. Rysher again breached the Term Agreement by refusing DJP access to the Nash Bridges masters so he could exercise his contractual and copyright rights to exploit the Series, including through "interactive devices."

49. As a result of Defendant's multiple breaches, DJP has suffered injury and is entitled to damages to be proven at trial.

50. Additionally, DJP is entitled to injunctive relief ordering Defendants to allow DJP access to the Series masters so that DJP can exploit the Series copyright through interactive devices in accordance with the terms of the Term Agreement.

### SECOND CAUSE OF ACTION — CONVERSION
### AGAINST ALL DEFENDANTS

51. Plaintiff incorporates by reference all of the allegations set forth in Paragraphs 1 through 50 of this complaint as though fully set forth herein.

52. Since 2001, Defendants have had physical possession of the Nash Bridges masters, and have converted to their own use the revenue generated from the exploitation and licensing of Nash Bridges. DJP is entitled to 50% of the profits generated from the exploitation and licensing of the Nash Bridges series as a co-owner of the Series copyright, yet Defendants have converted all of the profits to their own use.

53. As a result of Defendants' unlawful conversion, DJP has suffered injury in an amount

1   to be proven at trial.

2   ### THIRD CAUSE OF ACTION — UNJUST ENRICHMENT

3   ### AGAINST ALL DEFENDANTS

4   54.   Plaintiff incorporates by reference all of the allegations set forth in Paragraphs 1

5   through 53 of this complaint as though fully set forth herein.

6   55.   Defendants have unjustly enriched themselves at DJP's expense by failing to remit

7   50% of the profit generated by Nash Bridges.  As a copyright co-owner, DJP is entitled to 50% of

8   the profit, but defendants have wrongfully withheld payment in violation of DJP's rights under the

9   Term Agreement and as a copyright co-owner.

10   56.   As a result of defendants' actions, DJP is entitled to restitution of all monies owed it

11   under the Term Agreement as a copyright co-owner, and damages in an amount to be proven at trial.

12   ### FOURTH CAUSE OF ACTION — ACTION FOR AN ACCOUNTING

13   ### AGAINST ALL DEFENDANTS

14   57.   Plaintiff incorporates by reference all of the allegations set forth in Paragraphs 1

15   through 56 of this complaint as though fully set forth herein.

16   58.   Under copyright law, a co-owner of a copyright must account to other co-owners for

17   any profits earned from licensing or use of the copyright.  As a 50% owner of the Nash Bridges

18   copyright, DJP is entitled to 50% of the profits as determined by Generally Accepted Accounting

19   Principles (GAAP) earned from exploiting the Series.

20   59.   DJP requests an order from the Court compelling defendants to account under GAAP

21   for all expenses, costs, revenue, advances, and royalties relating to the distribution, sale, release,

22   display, broadcasting, and licensing of Nash Bridges.

23   ### FIFTH CAUSE OF ACTION — INTENTIONAL INTERFERENCE WITH PROSPECTIVE

24   ### ECONOMIC ADVANTAGE AGAINST ALL DEFENDANTS

25   60.   Plaintiff incorporates by reference all of the allegations set forth in Paragraphs 1

26   through 59 of this complaint as though fully set forth herein.

27   61.   DJP's previous lawyer contacted executives from Rysher, 2929 Entertainment, and

28   Qualia Capital repeatedly from 2006 to 2007, expressing DJP's desire to access the Series masters so

11
COMPLAINT

1   it could exploit Nash Bridges through online and mobile interactive devices.  Despite knowing that

2   DJP had live offers to do so, no defendant granted DJP access to the Series masters.

3       62.   Rysher, 2929 Entertainment, and Qualia Capital interfered with DJP's efforts to exploit

4   Nash Bridges through interactive devices by denying DJP access to the Series masters. This denial

5   was unlawful given that DJP is a 50% copyright co-owner in the Series and Section IV-1 of the

6   Term Agreement guarantees DJP all rights to exploit Nash Bridges through interactive devices.

7       63.   Defendants interfered with DJP's prospective economic advantage with knowledge and

8   intent because they knew that under the Term Agreement DJP owned 50% of the Series copyright

9   and he controlled all rights to exploit the copyright in interactive devices.  Furthermore, by sending

10   defendants several emails throughout 2006 and 2007, DJP put the defendants on notice that it wanted

11   to access the Series masters so it could exercise its right to exploit Nash Bridges through interactive

12   devices.  Given this knowledge, the defendants intended to deny DJP its contractual right to exploit

13   the copyright by denying it access to the masters.

14       64.   As a result of defendants' unlawful interference with DJP's prospective business

15   interests, DJP has suffered injury in an amount to be proven at trial.

16                  **PRAYER FOR RELIEF**

17       **WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

18       65.   Plaintiff seeks a money judgment for general, special, consequential, punitive,

19   exemplary and other damages in an amount be proven at trial;

20       66.   Plaintiff also seeks an injunction ordering Defendants to allow DJP access to the Series

21   masters so that DJP may exploit the Series copyright through interactive devices;

22       67.   Plaintiff also seeks an award of attorneys' fees as allowed by contract, tort, and other

23   law; an award of costs of suit as allowed by law; interest on damages as allowed by law; and such

24   other and further relief as the Court deems proper, fair, equitable, and appropriate.

25

26

27

28

Exhibit A, Page 26

## JURY DEMAND

68.   Plaintiff respectfully demands a trial by jury for all causes of action for which a jury trial is permitted.

DATED:  February 17, 2009                     KIRKLAND & ELLIS LLP


By: _____

                                              Mark Holscher

Attorneys for Plaintiff
Don Johnson Productions, Inc.

13
**COMPLAINT**

Exhibit A, Page 27

SENT BY:Z. B. B. & P.    : 4- 8-87 : 3:01PM :    Z. B. B. & F.→    8101820828501# 7/22

**RED-LINED COPY**

Agreement dated as of December 7, 1994 between _____ Entertainment, Inc. ("Rysher") and Don Johnson Productions, Inc. ("DJP") for the services of Don Johnson ("Johnson").

1. **Term:** A period commencing upon expiration of DJP's overall television deal with Paramount (i.e., April 1, 1995) and continuing until, at DJP's option, either (i) the date, if any, the Commitment Cancellation Fee described in paragraph 6 of the CBS Agreement attached hereto as Exhibit "A" is triggered ("Cancellation Date"); (ii) the date upon which no television series commitments under the CBS Agreement are in development or production hereunder ("End of Production"); (iii) six months after the Cancellation Date, or (iv) six months after the end of Production.

2. **Advance:** $1,000,000, one-half of which shall be applicable against the guaranteed compensation payable to DJP with respect to the first television series produced hereunder and the other one-half of which shall be applicable against the feature film described in paragraph III.3.a. below; provided, however, that if DJP is not entitled to the feature film money, DJP shall repay one-half of the advance to Rysher promptly upon expiration of the Initial Feature Period, as described below. If DJP becomes obligated to repay one-half of the advance as aforesaid, Rysher shall be entitled to offset the unpaid portion of such obligation against any other payments it is required to make to DJP hereunder.

3. **Overhead:**

a. During the Term, DJP will be provided with first class office space and furnishings ("Office Space") at 3400 Riverside Drive in Burbank, sufficient to comfortably house DJP's operations, plus telephones, facsimile, reproduction equipment and supplies, reasonable messenger and mail services, and other customary office services ("Office Services"). DJP will be furnished with up to $1.25 million (the "Overhead Cap") in overhead and business expenses, including personnel, travel, entertainment and Office Services, but excluding Office Space ("Overhead Expenses") for each year of the Term (prorated for any partial year), which shall be increased by $50,000 in the second and each subsequent year of the Term (i.e., $1.3 million in the second year, $1.35 million in the third year, etc.). All personnel (which shall be employees of Rysher or an affiliated entity and any costs for fringe benefits and payroll taxes for such personnel shall be deducted from the Overhead Expenses. Rysher will promptly reimburse DJP for any Overhead Expenses incurred by DJP up to the Overhead Cap, upon submission of reasonably appropriate receipts.

b. A fraction, the numerator of which shall be one, and the denominator of which shall be the number of television projects produced hereunder (other than the Starting Series), of the total Overhead Expenses incurred hereunder shall be charged to the cost of production of each television project (other than the Starting Series) produced hereunder. The foregoing shall be accomplished as follows:

Ex A

11/15/99   17:87   WFH BUSINESS AFFAIRS → 914162502046

SENT BY:Z. B. B. & F.   : 4- 8-87 ; 3:01PM ;   Z. B. B. & F.→   918162382250;# 8/22

(i)   One hundred percent (100%) of the Overhead Expenses incurred prior to the release of the second such television project shall be charged to the cost of production of the first such television project.

(ii)   Upon release of the second such television project, concurrently therewith, fifty percent (50%) of the Overhead Expenses incurred prior thereto, shall be credited to the cost of production of the first such television project and fifty percent (50%) thereof shall be charged to the cost of production of the second such television project.

(iii)   For each subsequent television project (other than the Starring Series) upon release of such succeeding television project, a prorata portion of Overhead expenses incurred prior thereto shall be allocated to that television project and an appropriate credit shall be made to each preceding television project. Said procedure shall be continued for each additional television project (other than the Starring Series) produced hereunder.

4.   Exclusivity:   DJP and Johnson are exclusive in television during the term, except for (i) the "Excluded Projects" listed in Exhibit "D", attached hereto (it being understood and agreed that there are no "Excluded Projects" other than those as set forth on Exhibit "D"), (ii) subsequent productions that are produced for television arising from themes or permitted television projects that Johnson and/or DJP does elsewhere, and (iii) non-series television projects which are either controlled by third parties or controlled by Johnson and/or DJP but rejected by Rysher. Notwithstanding the foregoing, Johnson shall not render acting services in a continuing role in a non-Rysher television series prior to the earlier of (i) end of production of the Starring Series (as defined below), or (ii) the Cancellation Date, without Rysher's written consent. Thereafter, in addition to all of the other things Johnson is permitted to do hereunder, Johnson shall be free to render acting services in a continuing series. During the Term, Rysher shall have a 10 day "first look" at any television or feature projects owned or controlled by DJP and/or Johnson that DJP and/or Johnson desire to develop. If Rysher is interested in developing any of said projects and so advises DJP in writing during the aforesaid 10 day period, then, if the project was submitted for television, the terms and conditions set forth in Section 11, below, shall be applicable, or, if submitted as a feature film, the parties shall work out an appropriate deal therefor in good faith. If they are unable to reach agreement with respect to any such feature project, or, as to any feature or television projects that Rysher rejects or is deemed to have rejected, DJP shall be free to pursue elsewhere with no further obligation to Rysher; provided, however, if there are any material new or additional elements, e.g. such as a lead actor, a director, a material change in story line not previously designed or a change in financial terms of the deal making it less favorable to DJP than that last submitted to Rysher, then Rysher will be advised and if shall have five (5) business days within which to accept such project with said changed, additional or new element(s). Johnson's services on outside projects will not materially interfere with DJP's obligations hereunder and shall be subject to any network exclusivity requirements applicable to the Starring Series as described in the license fee agreement for the Starring Series (the "Starring Series License Fee Agreement"). The parties acknowledge and agree that the Starring Series License Fee Agreement shall be subject to DJP's prior approval, such approval not to be unreasonably withheld.

824.105
May 17, 1995

JOHNSON/DJP/RYSHER

-13-

SENT BY:Z. B. B. & F.     : 6- 8-97 ; 5:02PM ;   Z. B. B. & P.→     8181623522250:# 9/22

### III. TELEVISION

1.   **Executive Producing Services:** Johnson shall have the right to function on any program or series hereunder as the sole Executive Producer (subject to network requirements) thereof for the life of the series. Johnson's services shall be non-exclusive.

2.   **Acting Services:** DJP shall furnish Johnson's services as the star of a television series to be produced for CBS pursuant to the CBS Agreement (the "Starring Series"). If the Starring Series is produced, DJP agrees that Johnson will be committed to render services thereon for the first four (4) production seasons, subject to any network option requirements set forth in the Starring Series License Fee Agreement.

3.   **Guaranteed Compensation - Television:**

a.   Acting - Series -- $125,000 for each 60 minute series episode, negotiate in good faith for episodes or television projects in excess of 60 minutes, with a floor of prorata.

b.   Executive Producing - Series -- $42,500 for each 60 minute series episode, negotiate in good faith for episodes or television projects in excess of 60 minutes, with a floor of prorata.

c.   Executive Producing - MOWs/Minis -- $62,500 per hour.

4.   **Contingent Compensation - Television:** 30% of the AGR, defined as all gross receipts from all sources received by Rysher or any affiliated entity (subject to the penultimate sentence of this Section II-4) after deduction of (i) a 15% distribution fee to Rysher in those media where Rysher directly distributes (excluding the network or other domestic "one-run" end-user license fee for the initial domestic runs, for which there shall be no distribution fees charged), (ii) distribution costs directly attributable to the distribution of the applicable production, (iii) direct production costs, and (iv) interest on the net deducted portion of the direct production costs. In any media where Rysher doesn't directly distribute and/or pays a third party a distribution, sub-distribution or administration fee of the like, Rysher will not charge any distribution fee or distribution fee override. Notwithstanding the foregoing, with respect to any territory and/or media in which Rysher generally distributes directly, if Rysher determines in its reasonable, good faith demonstrable business judgment that it is more commercially advantageous to both Rysher and DJP to have a third party distribute in media or territories in which Rysher would ordinarily distribute itself (i.e., because of blocked funds, a particularly advantageous packaging opportunity, etc.), Rysher shall be entitled to charge the aforesaid 15% distribution fee. As part of the production costs, Rysher shall charge a $75,000 per hour overhead/production fee in lieu of any other overhead fees or charges ("Rysher Overhead Fee"). No interest shall be charged on the Rysher Overhead Fee. Third party participations and packaging commissions shall be subject to DJP approval and shall be deducted off the top. DJP shall be entitled to customary annual audit rights. If an entity with whom Rysher contracts is a Rysher affiliate but is also a so-called "end-user", such entity shall not be treated as an affiliate for purposes of the first sentence

931.100
May 11, 1997

-3-

JOHNSON/RYSHER.AGR

SENT BY:2. , B. , B. , & P. ;   : 4- 3-97 : 3:02PM :   2. , B. , B. , & P. →   91818282822801#10/22

of this Section II-4 with respect to any monies received by such affiliate in its capacity as end-user (as opposed to as a distributor or sales agent; provided, however, that any agreement Rysher makes with such entity shall be done in good faith on an arm's length basis. Additionally, Rysher shall not include any production produced hereunder in a package for sale, license or other disposition in such a manner as discriminates against or in any way fails to maximize the profitability of said production.

5.     **Production Costs/Production Commitment**: Rysher shall be responsible for all production costs in connection with any series or other projects produced hereunder. The direct production costs of the Starting Series (inclusive of the Rysher Overhead Fee) shall be approximately $1.5 million per 60 minute episode ("Budget Cap"). The Budget Cap shall include all executive producer or other producing fees; provided, however, that the Budget Cap shall be increased by an amount equal to the amount by which all such executive producing/producing fees (excluding the Rysher Overhead Fee, DJP's executive producer fee and any line producer fees) exceed the sum of $75,000, it being specifically understood and agreed that, in accordance with the provisions of this sentence, the Budget Cap has heretofore been increased by $13,000 and any further increases required for excess executive producing/producing fees shall be subject to Rysher's approval, such approval not to be unreasonably withheld. The parties acknowledge that the direct production costs of the Series may exceed the Budget Cap on the first 8-10 episodes, and they will work together in good faith to determine an appropriate budget therefor. If CBS orders the Starting Series, Rysher agrees to produce at least 13 episodes thereof.

6     **Cross-Collateralization**: No crossing as between different projects hereunder.

7.     **Spin-Off Series/Subsequent Productions**: Rysher shall own all rights in and to spin-off series, subsequent productions and other productions based upon any productions produced hereunder; provided, however, that, at DJP's election and subject to his availability to render non-exclusive executive producer services, DJP shall be engaged thereon on the terms and conditions set forth in this Section II (excluding Johnson's acting services), including, without limitation, the contingent compensation set forth in Section II-4. If DJP elects not to render any services on such production or is unavailable as aforesaid or wishes to instead render services as a consultant, DJP shall be entitled to an amount equal to 1/2 the applicable fees (again, excluding acting) and 1/2 the percentage of contingent compensation. Additionally, Rysher shall furnish DJP with appropriate offices and overhead required to render such services (as distinguished from Rysher's obligation to furnish Office Space and Overhead Expenses pursuant to Section I-3) in the event DJP renders services in connection with any such project produced after the expiration of the Term.

8.     **Creative and Business Controls**: On all television productions produced hereunder, DJP and Rysher shall have mutual approvals regarding creative and business elements and decisions, which approvals shall be subject to the network's approval rights. If the direct production costs of the Starting Series exceed or are reasonably projected to exceed the Budget Cap without Rysher's approval, or if DJP's exercise of its approvals will cause Rysher to miss a delivery or broadcast date, the missing of which would cause (or, in Rysher's best business judgment, are reasonably projected to cause) the Budget Cap to be exceeded or Rysher to be in

- 6 -

90   39Vd                    ANVAWOO NOSN-NOP NOI          8882882818T6    98:1/1  FEAT/ICT/AN

breach of a third party obligation. Rysher shall have the final say with respect to business and creative matters pursuant to this paragraph 8 on the particular episodes and/or programs affected.

9.   **Credits:** For each television production produced hereunder –

a.   **Executive Producing** – Subject to network requirements, DJP will designate the executive producer and producing credits for each project produced hereunder, which credits shall each be on a separate card in the main and/or first position end titles (as DJP shall determine) and in paid advertising issued under Rysher's control. Johnson's credit in paid advertising shall be subject to customary exceptions and exclusions; provided, however, that Johnson shall receive credit in any so-called "excluded or excepted advertising" in which any other individual credit appears, excluding only award and congratulatory advertising in which only the honored individual is mentioned. No other individual may be accorded an executive producer credit without DJP's approval. Additionally, DJP shall have approval of all persons receiving any form of "producer" credit (including supervising, associate and co-producers) and the placement thereof. In connection with the Starring Series, DJP has approved a main-title executive producer credit for Ted Mann and Anne Hamilton on a card shared between the two of them. All other characteristics of such credits shall be subject to DJP's approval, not to be unreasonably withheld. DJP presently anticipates that Johnson's executive producer credit thereon will be on a separate card in the first position and titles immediately before the commercial break, as DJP shall designate with more specificity.

b.   **Production Credit** – DJP shall receive a production credit, including logo, to be shared only with Rysher, such credit to appear in the end titles of each project produced hereunder on a separate card immediately preceding the Rysher end title logo or credit and in paid advertising issued under Rysher's control. DJP may, at its election, substitute for the aforesaid production credit a so-called signature production credit which may include a logo and/or a music signature and/or a voice over. No other production credits will be accorded without DJP's approval; provided, however, that Rysher may elect to share its own production credit with another financier, broadcaster and/or distributor.

c.   **Acting Credit** – Johnson shall receive customary first class, first star billing, on screen in the main titles and in paid advertising issued under Rysher's control, the size of which shall be no less than 100% of the size of the title and, in any event, no smaller or less prominent than any other credit accorded in connection with the Starring Series. Johnson's credit shall be above-the-title unless the parties hereto mutually agree to the contrary. Johnson's credit in paid advertising shall be subject to customary exceptions and exclusions; provided, however, that Johnson shall receive credit in any so-called "excluded or excepted advertising" in which any other individual credit appears, excluding only award and congratulatory advertising in which only the honored individual is mentioned.

10.   **First Term Services and Materials:**

a.   **First Term Materials:** DJP shall have an 18-month turnaround to any properties or projects submitted to Rysher by DJP, accepted by Rysher for development, not sold

-4-

11/15/99   1:47   MFH BUSINESS AFFAIRS + 91415235348   NO.564   P03

SENT BY:Z., B., B., & F.   : 4- 8-97 : 3:03PM :   Z., B., B., & F.→   9151023382250:#12/22

to a network or other end-user and thereafter abandoned by Rysher. For purposes hereof, a project shall be deemed "abandoned" if any consecutive 50 day period continues during which there is no "development activity" thereon and, after notice from DJP thereof, Rysher fails to resume "development activity" within thirty (30) days after such notice. Examples of "development activity" for the purpose of this provision are: (i) employment of a writer to render writing services on the project; (ii) actively shopping the project to networks or other potential end-users; and (iii) engaging in preproduction activities such as budgeting, location-scouting, etc. DJP's turnaround right shall be subject to the obligation to reimburse Rysher for its direct, "out-of-pocket" costs, if any, excluding overhead but including interest, which were incurred by Rysher in connection with the applicable project and not otherwise reimbursed ("Rysher Reimbursable Costs"). If applicable, Rysher shall be paid the Rysher Reimbursable Costs at such time, if ever, as DJP receives any money (exclusive of so-called "pier-throughs") from the exploitation or disposition of such project, but, at to each such project, in no event later than the commencement of principal photography of the first production based thereon. Properties shall be deemed to have been "sold" to a network or other end-user if they have actually been produced during the term of this agreement or while they are in active development with a network or end-user. Any unproduced property or project which reverts under a network or other end-user and after the expiration of the Term shall likewise be subject to DJP's turnaround rights in the event Rysher abandons such project as described above. If DJP is unsuccessful in acting any such project up during the 18 month turnaround period, all rights therein shall remain with Rysher, subject to DJP's right to be engaged thereon (subject to DJP's availability as and when reasonably required) pursuant to the applicable terms of this agreement (excluding acting) if such project is later produced.

    b.  Post Term Services: At DJP's election and subject to his availability to render non-exclusive executive producer services, DJP shall have the option to furnish Johnson's non-exclusive executive producing services as set forth in Section II-1 for the life of any series or other production produced hereunder. DJP shall be engaged thereon on the terms and conditions set forth in this Section II (excluding Johnson's acting services), including, without limitation, the contingent compensation set forth in Section II-4. If DJP elects not to render any services on such production or is unavailable as aforesaid or wishes to instead render services as a consultant, DJP shall be entitled to an amount equal to 1/2 the applicable fees (again, excluding acting) and 1/2 the percentage of contingent compensation. Rysher shall furnish DJP with appropriate office and overhead required to render such services (as distinguished from Rysher's obligation to furnish Office Space and Overhead Expenses pursuant to Section I-3) in the event DJP renders services in connection with any such project produced after the expiration of the Term.

    11.  **Commitment Cancellation Fee**. If CBS is obligated to pay the Commitment Cancellation Fee, DJP shall be entitled to keep the Commitment Cancellation Fee for its own account, less any fees DJP was paid in connection with any episodes of the Starting Series produced hereunder (the "Offset Amount") and the Offset Amount shall be paid by CBS directly to Rysher. DJP shall be entitled to keep all other cancellation fees described in the CBS Agreement for its own account.

531.900
May 11, 1996

JOHNSON/DJP/RYSHER.IV

- 6 -

PAGE  09   3:04PM   ANMARCO NICKSHOP NEO   9152295291915   DZ1A1  4431/A1/A1

11/15/99   17:07   WMA BUSINESS AFFAIRS → 914152534348   NO.954   D09

SENT BY:Z. B. B. & F.   : 4- 8-97 : 3:04PM ;   Z. B. B. & F.   9101023022501:013/22

The _____ DJP and Ryther will share the _____ in the Starring Series on a 50/50 basis; provided, however, that DJP's _____ in the copyright as aforesaid shall only vest in the event CBS orders the Starring Series for three (3) full broadcast seasons (no 66 episodes). DJP will _____ and deliver to Ryther _____ in a form to be worked out in good faith between the parties _____ to enable Ryther (and/or Ryther's) _____, licensee or designee) to deal with the _____ the Starring Series. The parties will also work out in good faith an appropriate way to _____ the provisions of this Section II-12 so that _____

_____ 4

1.   Initial Commitment.   In further consideration for Johnson agreeing to render services in connection with the Starring Series for Ryther hereunder, Ryther agreed to engage DJP to furnish the services of Johnson to act in one feature film (the "Starring Feature") the production of which commenced during the two year period commencing on the date hereof (the "Initial Feature Period"), subject to extension for any of the following that usually delay the commencement of production — events of force majeure, Johnson's unavailability and other matters outside the control of Ryther. Additionally, Ryther agrees to engage DJP to furnish the producing services of Johnson in connection with another feature film (the "Produced Feature") during the Initial Feature Period.

2.   Producing Services.   DJP's and Johnson's producing services in connection with the Produced Feature shall be non-exclusive, although no services rendered for any third parties shall materially interfere with DJP's non-exclusive producing services.

3.   Compensation - Feature Films.

a.   The Starring Feature:

i.   Cash - $1.5 million, on a pay-or-play basis, payable over the scheduled period of principal photography of the Starring Feature.

ii.   Contingent - 2.5% of AGR at CBE with a 20% fee, escalating to 5% of AGR at CBE with a 25% fee, escalating to 10% at IABE. CBE and IABE shall be computed on a rolling basis.

b.   The Produced Feature:

i.   Cash - $400,000, on a pay-or-play basis, payable in the usual 30/60/70/10 formula.

ii.   Contingent - 5% of AGR at CBE determined on a rolling basis, with a 25% fee against 50% of 100% of net, reducible to said floor of 50% and a said floor of 7.5%.

- 7 -

-------

SENT BY:Z. B. B. & F.   ; 4- 8-97 ; 3:04PM ;   Z. B. B. & F.→   9101032022501:014/22

4.   Selection Mechanism:

a.   Starring Feature: During the Initial Feature Period, Ryther shall submit at least 5 screenplays to Johnson that Ryther is prepared to produce at a direct cash budget (including DJP's fee and a 10% overhead fee to Ryther, but excluding contingency amounts, interest, financing fees, completion bond fees and other "soft" costs) of no less than $15 million. The aforesaid screenplays shall each have a first star role for Johnson which Ryther, in good faith, believes is appropriate for Johnson. If Ryther fails to submit 5 such screenplays to Johnson during the Initial Feature Period, or if Johnson selects one of the screenplays and Ryther _____

SENT BY:Z., B., B., & P.    : 4- 8-97 ; 3:05PM :    Z., B., B., & P.→    8181238222501#15/22

customary motion picture industry practices and consistent with Johnson's previous acting agreement.

b.    The Produced Feature: DJP/Johnson would receive producer credit in the main titles (or wherever all the other credits are) and production company credit and cannot be pay-or-played out of its credits in any instance. The production company credit would be above the title and both credits would be no less than 100% size of regular title with 25% artwork floor in paid ads, subject to customary paid ad exclusions. Size, prominence, etc., on screen and in paid ads no less than any other non-cast credits accorded on the Produced Feature. Other usual first class producing credit provisions (e.g., tie-in in excluded advertising, etc.) to be worked out in good faith within customary motion picture industry practices and consistent with Johnson's other producing agreements.

6.    Subsequent Productions: For a period of 7 years following initial release of the applicable Produced Feature, DJP shall have the right to be engaged as a non-exclusive producer on any productions based upon any Produced Feature, on terms and conditions to be negotiated in good faith with a floor of the terms applicable to DJP's engagement on the Produced Feature (except the deal on any t.v. or other productions that are not intended for initial theatrical release shall be negotiated in good faith). The foregoing 7 year period shall apply to each subsequent production based on a Produced Feature.

7    Cross-Collateralization: No cross-collateralization between projects whatsoever.

8.    Controlling Rights and Approvals: Ryaher shall have the right to make all decisions regarding the production, distribution, and exploitation of all feature films produced hereunder; provided, however, that Ryaher shall consult with DJP in connection with material business and creative production decisions and in connection with the initial U.S. advertising campaign and release schedule for any pictures produced hereunder; provided, further, however, that Ryaher's decision with respect thereto shall be final. Notwithstanding the foregoing, Johnson shall have approval rights on any Starring Feature with respect to the screenplay, director, co-stars, and the personnel to be utilized for his hair, makeup, stunts, driver, stand-in, etc., and all provisions with respect to such personnel (including Johnson's approval rights) shall be consistent with Johnson's previous acting agreements. All approvals shall be exercised reasonably and in good faith and not in a manner designed to frustrate the timely production of the applicable project in accordance with the approved budget and schedule.

9.    Miscellaneous Acting and Producing Provisions: Other provisions with respect to Johnson's acting and producing services (e.g., trailer, use of name and likeness, transportation and expenses, etc.) shall be worked out in good faith, consistent with Johnson's previous feature deals and consistent with the applicable picture's approved budget and schedule.

10.    Additional Feature Commitments: In the event CBS orders the Starring Series for three (3) full broadcast seasons, thereby triggering an additional Series commitment (which DJP shall do with Ryaher on the same basis as the Starring Series (excluding only the acting fee).

-9-

SENT BY:Z, B, B, & F.      : 4- 8-97 : 3:05PM :    Z, B, B, & F.→      8181823322501416/22

Rysher shall give DJP an additional Starring and Produced Feature Film commitment on the same terms and conditions as those described above in this section III.

1.   Interactive Devices:  DJP shall reserve all rights in "interactive devices" based on television series or other television productions produced hereunder which, it is anticipated, the parties will exploit together; provided, however, that DJP and Rysher shall work out an agreement with respect thereto (including a fee to DJP for its services on the interactive devices and the use of Johnson's name and likeness) in good faith and, provided further, that Rysher will have approval over any agreements DJP proposes to enter into licensing or otherwise disposing of any rights in interactive devices.  For purposes hereof, "interactive devices" shall be deemed to include games or other materials based upon any such television series and appearing on CD-ROM, CD-I, 3DO, Sega, Nintendo or other cartridge, disc or computer-assisted devices.  The parties understand and agree that all revenue received by DJP and/or Rysher in connection with interactive devices shall be included in gross receipts until Rysher has recouped its direct production costs and interest on the net defected portion of the direct production costs of the applicable television series or other production and any amounts received after such recoupment shall be divided between the parties hereto pursuant to the agreement to be worked out in good faith pursuant to the provisions of this paragraph IV-1.

2.   ICM Package:  The parties hereto acknowledge that the television productions produced hereunder shall be subject to an ICM package fee.

Agreed and Accepted:

DON JOHNSON PRODUCTIONS, INC.          RYSHER ENTERTAINMENT, INC.

By_____              By_____

-10-

**RYSHER - 1ST AMMENDMENT**

**7/21/97**

**6 PAGES**

11/15/99   17:07   WMA BUSINESS AFFAIRS → 914156354348   P.2

7-23-1997 12:21PM   FROM OFF DUTY  PRODUCTION 415 263 4348

SENT BY:Z., B., & F.   : 7-21-97 :11:31AM :   Z., B., & F.-   :# 4/13

## AGREEMENT

THIS AGREEMENT, entered into as of [illegible] 1997, by and between [illegible] Entertainment, Inc. ("Rysher") and [illegible] ("DJP") for the services of Don Johnson ("Johnson").

WHEREAS, the parties hereto entered into an agreement dated as of [illegible] 1996 (the "Term Agreement") with respect to, among other things, the potential services of DJP and Johnson in a television series for Rysher.

WHEREAS, pursuant to the Term Agreement, Johnson and DJP were engaged by Off Duty Productions, Inc. ("Off Duty") to render services in connection with a television series known as "Nash Bridges" (the "Series");

WHEREAS, in order to continue to produce the Series, the parties hereto desire to resolve certain differences that have arisen between them with respect to the Series and to amend the Term Agreement;

NOW, THEREFORE, the parties hereby agree that:

1.     Paradise-French Entertainment ("PFE") are being engaged as producers of the Series and will be exercising financial approvals and controls in connection with the Series on behalf of Rysher.

2.     Notwithstanding the foregoing, the producing and production credits accorded DJP, Johnson, and Carlton Cuse in connection with the Series shall remain the same as they were for the 1996/97 production season. Papazian and Ffrench shall receive credit as co-executive producers.

3.     Notwithstanding the provisions of paragraph 5 of the Term Agreement, the parties intend to produce the Series for approximately $2.1 million per 60 minute episode.

4.     For purposes of paragraph 5 of the Term Agreement, the Budget Cap will be the sum of $2.1 million per 60 minute episode. Notwithstanding anything to the contrary in paragraph 5 of the Term Agreement:

A.     If Johnson engages in unreasonable conduct within his control (which is not cured as provided in paragraph 6.E below) and as a result the direct production cost to produce any particular episode of the Series exceeds or is reasonably expected to exceed what the cost otherwise would have been to produce the particular episode, Johnson shall forfeit his approval rights with respect to the particular episode.

B.     If DJP's exercise of any of its approval rights will cause Rysher to miss a delivery date, the missing of which would result in harm to what the cost otherwise

PAGE 38   DON JOHNSON COMPANY   [illegible]   [illegible]

would have been to produce a particular episode of the Series or a breach by Rysher of a third party obligation, Rysher shall be entitled to exercise the final approval rights with respect to business and creative matters on the particular episodes.

C.   Johnson's mutual approvals of the creative areas described in the attached Exhibit "A" will be exercised pursuant to the time frames set forth therein.

D.   If DIF and Rysher are unable to reach mutual agreement as to any business or creative matter, Rysher may break deadlock whenever production exigencies require and, Rysher's decision with respect to any such matter shall be final and binding.

5.   The DIF and Johnson perquisites paid out of the budget of the Series shall change from the previous season's pattern budget as tentatively described in Exhibit "B", attached hereto, which the parties are working out in good faith.

6.   DIF and Rysher have disputed whether any further payments are owed DIF pursuant to paragraphs III.3.a and b of the Term Agreement ("Palmer Payments"). In connection therewith the parties have agreed that a sum equal to the difference between the Palmer Payments heretofore made to DIF pursuant to said paragraphs (i.e., $500,000) and the sum of $2.5 million shall be paid to DIF as follows, subject to the reductions set forth in paragraph 6.E below:

A.   $1,000,000 shall be paid to DIF upon the later of: (i) the commencement of production on the 1st episode of the 1997-98 production season, or (ii) full execution of this Agreement.

B.   $500,000 shall vest upon completion of production of the 11th episode of the Series for the 1997-98 production season and, to the extent not reduced pursuant to paragraphs 6.E or 7 below, shall be paid to DIF upon the earlier of: (xx) sixty (60) days after the completion of production of the 22nd episode of the 1997-98 production season, or, (yy) June 30, 1998.

C.   $500,000 shall vest upon completion of production of the 22nd episode of the 1997-98 production season and, to the extent not reduced pursuant to paragraphs 6.E or 7 below, shall be paid to DIF upon the earlier of: (xx) sixty (60) days after completion of production of the 22nd episode of the 1997-98 production season, or, (yy) June 30, 1998.

D.   $1,000,000 shall be paid to DIF upon the commencement of principal photography of the 1st episode of the 1998-99 production season; provided, however, that such $1,000,000 shall be subject to reduction pursuant to paragraph 7, and by up to $500,000 pursuant to paragraph 6.E below.

E.   Notwithstanding anything to the contrary in this paragraph 6, if Johnson engages in unreasonable conduct within his control (which such conduct, if curable, Johnson does not cure following notice thereof from Rysher, and a reasonable opportunity to

-2-

11/15/99    17:07    WH BUSINESS AFFAIRS → 914132654540                              NO. 304   P02

7-23-1997 12:22PM    FROM OFF DUTY PRODUCTION 415 263 4340               P. 4

SEN BY:Z. B. B. & F.    : 7-21-97 111:53AM :    Z. B. B. & F.-                       # 0/13

do so taking into account the exigencies of production) and which actually and directly causes the cost to produce any particular episode during the 1997-98 production season to exceed what the cost otherwise would have been to produce the particular episode as established by Ryder in good faith, then, in addition to whatever other remedies they may have at law, Ryder shall be entitled to reduce the Feature Payment due DIP as provided under paragraphs 6.B and/or 6.C and/or 6.D above, as well as the last monthly overhead payment (i.e., $77,000) due DIP during the 1997-98 production season, by the amount which was actually paid by Ryder (i.e., by reason of Johnson's aforementioned incurred unreasonable conduct) in excess of what the cost would have been to produce the episodes of the Series during the 1997-98 production season ("Excess Payments") which are not reimbursed by insurance or any other party. Within ten (10) business days after the end of each calendar month during the 1997-98 production season Ryder shall provide Johnson with a detailed accounting of all Excess Payments made by Ryder in such calendar month. In the event DIP desires to contest any reduction by Ryder of the Feature Payment by virtue of Excess Payments pursuant to this paragraph 6.E, then within thirty (30) days after the completion of production of the last episode of the 1997-98 production season, DIP shall submit such dispute to arbitration pursuant to a single, mutually approved arbitrator with applicable experience in the entertainment industry. Each party shall bear its own costs in connection with .... If .... the parties cannot mutually agree upon a single arbitrator, then each party shall select its proposed arbitrator and the two proposed arbitrators shall as soon as practicable thereafter (but no later than two (2) business days) select the arbitrator, who shall actually preside over such arbitration.

F.    Notwithstanding anything to the contrary in the Term Agreement or this Agreement, Johnson shall have no obligation to render services pursuant to paragraphs III.1.a or b of the Term Agreement.

G.    Ryder has the right to recoup (off the top) any Feature Payments (plus interest thereon calculated at the then prevailing "prime rate" plus one percent (1%) thereon as charged by Ryder's principal lender from the date of payment or each applicable Feature Payment through the date of the full recoupment thereof) made to Johnson pursuant to the Term Agreement or this agreement out of the Gross Receipts derived from the exploitation of the Series; provided, however, that Ryder shall not be entitled to charge overhead with respect thereto.

7    Ryder has advised DIP that the per occurrence deductible applicable to the Series cast insurance covering Johnson's illness and injury is increasing for the 1997-98 season from $12,000 to $250,000. The parties have agreed that, to the extent any claims are made based upon Johnson's illness or injury, the first $25,000 of the insurance deductible shall be borne by Ryder as a cost of production, and any remaining portion of the deductible shall be borne by DIP and deducted on a pro rata basis from each episode fee payable to DIP for acting services in connection with the Series episodes remaining to be produced during the 1997-98 season; provided, however, that if the remaining episodic payments are insufficient to cover DIP's share of the deductible, Ryder shall be entitled to deduct any remaining portion of DIP's share of the deductible from any other payments due DIP

-3-

021.000.1
July 21, 1997

T-23-1997 12:24PM   FROM OFF DUTY PRODUCTION 415 263 4342                    P.5
SENT BY: ... B... R... & F.     7-23-97 11:55AM    ... B... R... & F.        15 7/10

hereunder, including without limitation, the Feature Payments. Notwithstanding the foregoing, Rysher shall be required to use its best efforts to mitigate any costs or expenses incurred as a result of any such illness or injury in an effort to keep any insurance claims occasioned thereby at law as possible. The parties agree that the total amount of insurance deductible for which DIP shall be responsible hereunder for each production season shall not exceed an amount equal to $67,500 times the number of episodes produced during such season. Additionally, if DIP desires to contest the nature or amount of any insurance claims attributed to his illness or injury hereunder, the parties shall follow the arbitration procedures set forth in paragraph 6.E. above.

8.   Rysher shall engage Elliot Mintz ("Mintz") on the Unit Publicist for the Series at the rate of $1,500 per month to the extent that the cost for Mintz's services is within the perquisite package hereunder established for Johnson in connection with the Series. In any event, any amounts paid to Mintz shall be deemed to be a cost of production.

9.   Rysher shall continue to indemnify DIP and Johnson and their heirs successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them of and from any and all claims, debts, liabilities, demands obligations, costs and expenses (including attorney's fees and costs), unless and causes of actions arising out of or relating to the Complaint against Rysher Entertainment and others by John Nicolella, d/b/a Film Outfitters, Inc.

10.   DIP shall continue to indemnify Rysher and its successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them of and from any and all claims, debts, liabilities, demands obligations, costs and expenses (including attorney's fees and costs), actions and causes of actions arising out of or relating to the claims made by Antonia Napoli and Kid Money (the "Former Employees") and the claims made by DIP and/or Johnson against the Former Employees; provided, however, that DIP's obligation to indemnify Rysher for attorneys' fees and costs shall be satisfied in full by DIP's reimbursing Rysher, within ten (10) days after DIP's receipt from Rysher of an invoice therefor, a sum not to exceed Fifty Thousand Dollars ($50,000) for all actual, verifiable costs incurred by Rysher.

11.   Rysher shall immediately pay to DIP any previously withheld overhead costs due pursuant to paragraph 3 of the Term Agreement.

12.   Commencing with the 1997-98 production season of the Series, Nash Bridges Productions, Inc. ("Nash") will act as the production entity for the Series. DIP will cause Off Duty to execute an assignment, assigning to Nash Off Duty's right to produce the Series and Nash will indemnify, defend and hold harmless Off Duty, DIP and Johnson from and against any and all claims, costs, losses and liabilities relating to the performance of all executory obligations created or incurred by Off Duty in good faith in connection with the development, production, distribution or exploitation of the Series through and including the date of such assignment, or arising or resulting from Nash's and/or any third party's actions or omissions in

7-23-1997  12:25PM   FROM OFF DUTY   PRODUCTION 415 283 4340   P.6

connection with the development, production, distribution or exploitation of the Series from and after the date of such assignment.  In connection with such assignment:

A.  Off Duty, DJP and Johnson will jointly and severally represent and warrant that:  (i) Off Duty has fulfilled all obligations required to be fulfilled by Off Duty prior to the date of such assignment; (ii) there are no third party contrary obligations other than those which Nash has been apprised of in writing prior to the parties entering into such assignment; and (iii) to the best of Off Duty's, DJP's and Johnson's knowledge, Off Duty is not subject to any actual or threatened third party claim or litigation, arbitration or other adversary proceeding in connection with the Series other than any which may have been disclosed to Rysher or Nash prior to or at the date of such assignment (all such claims and proceedings in connection with the production of the Series through the date of such assignment, regardless whether disclosed to Rysher or Nash, shall hereinafter be referred to collectively as, the "Claims");

B.  Off Duty, DJP and Johnson will jointly and severally indemnify, defend and hold harmless Rysher against:  (i) any breach of the representations and warranties set forth in clauses (i) through (iii) of paragraph 12.A above; and, (ii) all Claims except to the extent resulting from Rysher's conduct as the financier or distributor of the Series, or the extent covered by Nash's representations, warranties or indemnification pursuant to paragraph 12 above.

13.  Subject to the above, the parties hereby release and forever discharge each other, as well as all of their respective heirs, successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them (each and all of whom are hereinafter referred to collectively as the "Released Parties") of and from any and all claims, debts, Exhibits, demands, obligations, costs and expenses (including attorney's fees), actions and causes of action arising out of or relating to the Series and the Term Agreement prior to the date hereof, excluding any new third party claims made after the date hereof and of which Rysher was not aware as of the date hereof.

14.  Although the Term Agreement and this agreement are subject to California law, the parties hereby waive and relinquish all rights and benefits under Section 1542 of the Civil Code of the State of California with respect to the matters released pursuant to paragraph 13, above, which said section reads:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The parties acknowledge that there may hereafter be discovered which are different from or in addition to those now known or believed to be true with respect to the claims, debts, Exhibits, demands, obligations, costs, expenses, actions and causes of actions herein released and agree that this instrument shall be and remain effective in all respects notwithstanding such different or additional facts.

SH.MB 1
JULY 21, 1997

-5-

PAGE 34   DON JOHNSON COMPANY

7-23-1997 12:25PM   FROM OFF DUTY  PRODUCTION 415 269 4346                    P.7
SENT BY: Z. B. B. & F.    : 7-21-97 :11:30AM :   Z. B. B. & F.

15.   The parties acknowledge that, except as herein expressly set forth, no representation of any kind or character has been made to any party by any other party hereunder or by any such parties' officers, agents, representatives or attorneys to induce the execution of this agreement. Without derogating from the parties' respective indemnity obligations set forth herein, the parties further acknowledge that this instrument effects the settlement of claims which are denied and contested and nothing herein contained shall be construed as an admission of liability by or on behalf of any of the parties hereto or any of the released parties, by all of whom liability is expressly denied.

16.   This agreement is binding on and shall inure to the benefit of Kyshu, DJP, Johnson and each and all of their respective heirs, executors, subsidiary, parent and/or affiliated firms and/or corporations, partners and/or associates, attorneys, assigns and successors wherever the context requiring or admits, all of whom may assert claims, rights, remedies and defenses under this agreement as though they were a direct party herein.

17.   Except as expressly amended herein, the Talent Agreement shall remain in full force and effect.

18.   This agreement shall be governed and construed exclusively in accordance with the laws of the State of California applicable to agreements executed and to be fully performed therein. This agreement supersedes the entire understanding between the parties, superseding and replacing all prior and contemporaneous oral and written understandings, with regard to the subject matter hereof. This agreement may not be amended except by a written instrument executed by the party to be charged.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first set forth above.

KYSHER ENTERTAINMENT, INC.

By: _____

DON JOHNSON PRODUCTIONS, INC.

By: _____

RYSHER - 2ND AMMENDMENT

4/21/98

9 PAGES

Mar-11-91 10:78am  From-                                                T-403  P.02/18  F-188

CLEAN COPY FOR R' 'IEW ONLY – PAGINATION NOT CORRECT

## SECOND AMENDMENT

THIS AGREEMENT, entered into as of _____, ____ by and between Rysher Entertainment, Inc. ("Rysher") and Don Johnson Productions, Inc. ("DJP") for the services of Don Johnson ("Johnson"):

WHEREAS, the parties hereto entered into an agreement dated as of _____, ____ _____ with respect to, among other things, the potential services of DJP and Johnson in a television series for Rysher;

WHEREAS, pursuant to the Term Agreement, Johnson and DJP were engaged by Off Duty Productions, Inc. ("Off Duty") to render services in connection with a television series known as "Nash Bridges" (the "Series");

WHEREAS, the Term Agreement was amended pursuant to an Agreement dated as of June 11, 1997 (the "First Amendment"); and

WHEREAS, in order to continue to produce the Series for the 1998-99 season, the parties hereto desire to resolve certain additional matters that have arisen between them with respect to the Series and to further amend the Term Agreement;

NOW, THEREFORE, the parties hereby agree that:

1.      Pepinan-Hirsch Entertainment ("PHE") have been engaged as producers of the Series for the 1998-99 season and will be exercising financial approvals and controls in connection with the Series on behalf of Rysher.

2.      Notwithstanding the foregoing, the producing and production credits accorded DJP, Johnson, and Carlton Cuse in connection with the Series shall remain the same as they were for the 1996/97 production season.  Pepinan and/or Hirsch shall receive credit as co-executive producers.

3.      Notwithstanding the provision of paragraph 3 of the Term Agreement, the parties intend to produce the Series for approximately $____ million per 60 minute episode.

4.      For purposes of paragraph 9 of the Term Agreement, the Budget Cap will be the sum of $____ million per 60 minute episode.  Notwithstanding anything to the contrary in paragraph 9 of the Term Agreement:

A.      If Johnson engages in unreasonable conduct within his control (which is not cured as provided in paragraphs A.ii below) and as a result the direct production cost to produce any particular episode of the Series exceeds or is reasonably expected to exceed

May-15-09  10:15am  From-                                        T-620  P 04/16  F-169

what the cost otherwise would have been to produce the particular episode, Johnson shall
forfeit his approval rights with respect to the particular episode.

B.      If DIP's exercise of any of its approval rights will cause Rysher to
miss a delivery date, the missing of which would cause an increase in what the cost
otherwise would have been to produce a particular episode of the Series or a breach by
Rysher of a third party obligation, Rysher shall be entitled to exercise the final approval
rights with respect to business and creative matters on the particular episodes.

C.      Johnson's initial approvals of the creative areas described in Exhibit
"A" attached to the First Amendment will be exercised pursuant to the time frames set forth
therein.

D.      If DIP and Rysher are unable to reach mutual agreement as to any
business or creative matter, Rysher may break deadlocks whenever production exigencies
require and, Rysher's decision with respect to any such matter shall be final and binding.

5.      The DIP and Johnson perquisites paid out of the budget of the Series shall be
the same as they were for the 1997-98 season.

6.      Inasmuch as Rysher is no longer in the feature film production business, DIP
and Rysher have agreed to scale out the Additional Feature Commitments described in
paragraph III-10 of the Term Agreement for the total sum of $2.5 million. In addition, the
parties have agreed that Rysher is entitled to reduce the Feature Payments potentially due
DIP pursuant to paragraph 6 of the First Amendment by the amount of $405,000 loaned to
DIP pursuant to paragraph 7 of the First Amendment, leaving a balance of $895,000.
The total of $3,295,000 will be paid to DIP as follows:

A.      $2,900,000 shall be paid to DIP upon execution of this Second
Amendment.

B.      $50,000 shall vest upon completion of production of the 11th episode
of the Series for the 1998-99 production season and, to the extent not reduced pursuant to
paragraph 6.B or 7 below, shall be paid to DIP upon the earlier of: (xx) sixty (60) days after
the completion of production of the 22nd episode of the 1998-99 production season or, (yy)
June 30, 1999.

C.      $50,000 shall vest upon completion of production of the 22nd episode
of the 1998-99 production season and, to the extent not reduced pursuant to paragraph 6.B
or 7 below, shall be paid to DIP upon the earlier of: (xx) thirty (30) days after completion of
production of the 22nd episode of the 1998-99 production season, or, (yy) June 30, 1999.

D.      $295,000 shall be paid to DIP upon the commencement of principal
photography of the 1st episode of the 1999-2000 production season; provided, however, that

Exhibit A, Page 46

11/15/99   17:07   WMH BUSINESS AFFAIRS → 914152634348                NO.564   D31

Mar-19-99 10:57am   From-                                      T-435  P.05/16  F-181

7.   Ryther has advised DIP that the per occurrence deductible applicable to the Series cast insurance covering Johnson's illness and injury for the 1998-99 season will again be $250,000 (as it was for the 1997-98 season). The parties have again agreed that, to the extent any claims are made based upon Johnson's illness or injury, the first $25,000 of the insurance deductible shall be borne by Ryther as a cost of production, and any remaining portion of the deductible shall be borne by DIP and deducted from the Feature Payments set forth in paragraph 6.B., C. and D of this Second Amendment; provided, however, that if the Feature Payments are insufficient to cover DIP's share of the deductible, Ryther shall be entitled to deduct any remaining portion of DIP's share of the deductible from up to $500,000 of overhead payments due DIP during the final six months of the Term Agreement. Notwithstanding the foregoing, Ryther shall be required to use its best efforts to mitigate any costs or expenses incurred as a result of any such illness or injury in an effort to keep any insurance claims occasioned thereby as low as possible. The parties agree that the total amount of insurance deductible for which DIP shall be responsible hereunder for the 1998-99 production season shall not exceed an amount equal to $67,500 times the number of episodes produced during such season. Within ten (10) business days after the end of each calendar quarter during the 1998-99 production season, Ryther shall provide Johnson with a detailed accounting of the total amount of insurance deductible, on a calendar quarter for which they feel DIP should be responsible hereunder. In the event DIP desires to contest the nature or amount of any insurance claims attributed to his illness or injury hereunder, the parties shall follow the arbitration procedure set forth in paragraph 6.B. above.

8.   Ryther shall engage Billet Minz ("Minz") as the Unit Publicist for the Series at the rate of $1,500 per month to the extent that the cost for Minz's services is within the perquisite package hereafter established for Johnson in connection with the Series. In any event, any amounts paid to Minz shall be deemed to be a cost of production.

9.   Ryther shall continue to indemnify DIP and Johnson and their heirs successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them of and from any and all claims, debts, liabilities, demands obligations, costs and expenses (including attorney's fees and costs), actions and causes of actions existing out of or relating to the Complaint against Ryther Determination and others by John Nicoletti, d/b/a Film Outfitters, Inc.

10.   DIP shall continue to indemnify Ryther and its successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them of and from any and all claims, debts, liabilities, demands obligations, costs and expenses (including attorney's fees and costs), actions and causes of actions arising out of or relating to the claims made by Antonia Napoli and Kim Murray (the "Former Employees") and the claims made by DIP and/or Johnson against the Former Employees; provided, however, that DIP's obligation to indemnify Ryther for attorney's' fees and costs shall be satisfied in full by DIP's reimbursing Ryther, within ten (10) days after DIP's receipt from Ryther of an invoice therefor, a sum not to exceed Fifty Thousand Dollars ($50,000) for all actual, verifiable costs incurred by Ryther.

SECOND                                              -4-                           SECOND
AMEND. 1999                                                                        AMEND.

Received  Mar-19-99  04:53pm   From-914152634348              To-                   Page  05

TO   MUNI        ANTONIO JOHNSON NON        0123456789616   03:18  6661/61/91

such $895,000 shall be subject to reduction pursuant to paragraph 7, and by up to $150,000 pursuant to paragraph 6.E below.

E.    Notwithstanding anything to the contrary in this paragraph 6, if Johnson engages in unreasonable conduct within his control (which such conduct, if exhibit, Johnson does not cure following notice thereof from Ryther, and a reasonable opportunity to do no taking into account the exigencies of production) and which actually and directly causes the cost to produce any particular episode during the 1996-99 production season to exceed what the cost otherwise would have been to produce the particular episode as established by Ryther in good faith, then, in addition to whatever other remedies they may have at law, Ryther shall be entitled to reduce the Future Payments due DJP as provided under paragraphs 6.B and/or 6.C and/or 6.D above, or only to the last monthly overhead payment (i.e. $77,000) due DJP during the 1998-99 production season, by the amount which are actually paid by Ryther (i.e., by reason of Johnson's aforementioned unusual, unreasonable conduct) in excess of what the cost would have been to produce the episodes of the Series during the 1998-99 production season ("Excess Payments"), which are not reimbursed by insurance or any other party. Within ten (10) business days after the end of each calendar quarter during the 1998-99 production season Ryther shall provide Johnson with a detailed accounting of all Excess Payments made by Ryther in such calendar quarter. In the event DJP desires to contest any reduction by Ryther of the Future Payments by virtue of Excess Payments pursuant to this paragraph 6.E, then within thirty (30) days after the completion of production of the last episode of the 1998-99 production season, DJP shall submit such dispute to arbitration pursuant to a single, mutually approved arbitrator with applicable experience in the entertainment industry. Each party shall bear its own costs in connection with the arbitration. If the parties cannot mutually agree upon a single arbitrator, then each party shall select its proposed arbitrator and the two proposed arbitrators shall as soon as practicable thereafter (but no later than two (2) business days) select the arbitrator who shall actually preside over such arbitration.

F.    Notwithstanding anything to the contrary in the Term Agreement, the First Amendment or this Second Amendment, Johnson shall have no obligation to render services pursuant to paragraph III-10 of the Term Agreement.

G.    Ryther has the right to recoup (off the top) any Future Payments paid DJP pursuant to this Agreement, the First Amendment or this Second Amendment (plus interest thereon calculated at the then prevailing "prime rate" plus one percent (1%) thereon as charged by Ryther's principal lender from the date of payment of such applicable Future Payment through the date of the full recoupment thereof) out of the Gross Receipts derived from the exploitation of the Series; provided, however, that Ryther shall not be entitled to charge overhead with respect thereto.

H.    Ryther has waived the right to claim any other contribution from DJP or Johnson pursuant to paragraph 6 or 7 of the First Amendment.

-3-

11. Ryther shall immediately pay to DIP any previously withheld overhead sums due pursuant to paragraph 3 of the Term Agreement, if any;

12. Ryther and/or Nash Entertainment, Inc. ("Nash") will indemnify, defend and hold harmless Off Duty Productions, Inc. ("Off Duty"), DIP and Johnson from and against any and all claims, costs, losses and liabilities relating to the production of the Series created or incurred by Off Duty, DIP or Johnson in good faith in connection with the development, production, distribution or exploitation of the Series through and including May 24, 1997, the date of that certain Assignment from Off Duty to Nash, or arising or resulting from Nash's and/or any third party's actions or omissions in connection with the development, production, distribution or exploitation of the Series from and after the date of such assignment. In connection therewith:

A. Off Duty, DIP and Johnson will jointly and severally represent and warrant that: (i) Off Duty has fulfilled all monetary obligations required to be fulfilled by Off Duty prior to the date of such assignment; (ii) there are no third party monetary obligations other than those which Nash has been apprised of in writing prior to the parties entering into such assignment; and (iii) to the best of Off Duty's, DIP's and Johnson's knowledge, Off Duty is not subject to any actual or threatened third party claim or litigation, arbitration or other adversary proceeding in connection with the Series other than any which may have been disclosed to Ryther or Nash in writing (all such claims and proceedings in connection with the production of the Series through the date of such assignment, regardless whether disclosed to Ryther or Nash, shall hereinafter be referred to collectively as the "Claims");

B. Off Duty, DIP and Johnson will jointly and severally indemnify, defend and hold harmless Ryther against: (i) any breach of the representations and warranties set forth in clauses (i) through (iii) of paragraph 12.A above; and, (ii) all Claims except to the extent resulting from Ryther's conduct as the financier or distributor of the Series, or to the extent covered by Nash's representation, warranties or indemnification pursuant to paragraph 12 above.

13. Subject to the above, the parties hereby release and forever discharge each other, as well as all of their respective heirs successors, representatives, assigns, agents, directors, officers, shareholders, trustees, employees and attorneys and each of them (each and all of whom are hereinafter referred to collectively as the "Released Parties") of and from any and all claims, debts, liabilities, demands obligations, costs, and expenses (including attorney's fees), actions and causes of action arising out of or relating to the Series, the Term Agreement and the First Amendment prior to the date hereof, excluding any new third party claims not specifically addressed in paragraph 12, above, made after the date hereof and of which Ryther was not aware as of the date hereof;

14. Although the Term Agreement, the First Amendment and this Second Amendment are subject to California law, the parties hereby waive and relinquish all rights

-5-

Exhibit A, Page 49

and benefits under Section 1542 of the Civil Code of the State of California with respect to the matters released pursuant to paragraph 13, above, which code section reads:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

The parties acknowledge that there may hereafter be discovered which are different from or in addition to those now known or believed to be true with respect to the claims, debts, liabilities, demands, obligations, costs, expenses, actions and causes of actions herein released and agree that this instrument shall be and remain effective in all respects notwithstanding such different or additional facts.

15.  The parties acknowledge that, except as herein expressly set forth, no representation of any kind or character has been made to any party by any other party hereunder or by any such parties' officers, agents, representatives or attorneys to induce the execution of this agreement.  Without detracting from the parties' respective indemnity obligations set forth herein, the parties further acknowledge that this instrument effects the settlement of claims which are denied and contested and nothing herein contained shall be construed as an admission of liability by or on behalf of any of the parties hereto or any of the released parties, by all of whom liability is expressly denied.

16.  This agreement is binding on and shall inure to the benefit of Ryther, DJP, Johnson and each and all of their respective heirs, executors, subsidiary, parent and/or affiliated firms and/or corporations, partners and/or associates, attorneys, assigns and successors wherever the context requires or admits, all of whom may assert claims, rights, remedies and defenses under this agreement as though they were a direct party hereto.

17.  Except as expressly amended herein, the Term Agreement and the First Amendment shall remain in full force and effect.

18.  This agreement shall be governed and construed exclusively in accordance with the laws of the State of California applicable to agreements executed and to be fully performed therein.  This agreement represents the entire understanding between the parties, superseding and replacing all prior and contemporaneous oral and written understandings, with regard to the subject matter hereof.  This agreement may not be amended except by a written instrument executed by the party to be charged.

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first set forth above.

RYTHER ENTERTAINMENT, INC.

-6-

Exhibit A, Page 50

By:_____

DON JOHNSON PRODUCTIONS, INC.

By:_____

-7-

Mar-13-09  04:03pm  From-PARAMOUNT NETWORK TV BUSINESS AFFAIRS     2136023700     T-042  P.04/11  F-144

## THIRD AMENDMENT

THIS THIRD AMENDMENT, entered into as of August 2, 1999, by and between Rysher Entertainment, Inc., its agents and assigns (collectively, "Rysher") and Don Johnson Productions, Inc. ("DJP") for the services of Don Johnson ("Johnson"):

WHEREAS, the parties hereto entered into an agreement dated as of December 7, 1994 (the "Term Agreement"), with respect to, among other things, the potential services of DJP and Johnson in a television series for Rysher.

WHEREAS, pursuant to the Term Agreement, Johnson and DJP were engaged by Dar Duty Productions, Inc. ("DJP-Duty") to render services in connection with television series entitled "Nash Bridges" (the "Series");

WHEREAS, the Term Agreement was amended pursuant to an Agreement dated as of June 11, 1997 (the "First Amendment"), and an Agreement dated as of May 6, 1998 (the "Second Amendment"); and

WHEREAS, the parties hereto desire to extend the term of the Term Agreement and resolve certain additional matters that have arisen between them with respect to the 1999/2000 and 2000/2001 Productions Years of the Series and to further amend the Term Agreement, as it already has been amended.

NOW THEREFORE, the parties hereby agree as follows:

1. 1999/2000  and 2000/2001 Production Years - Services:  Notwithstanding Paragraphs 8.1 and 8.2 and 8.3 of the Term Agreement, the parties agree that commencing on or about August 2, 1999, Johnson is obligated to provide exclusive non-writing Executive Producer and Actor services in the Series for 22 episodes in the 1999/2000 Production Year.  Rysher shall thereafter have an exclusive option to extend the term of Johnson's employment for the 2000/2001 Production Year (the "Option"). The Option shall be immediately and automatically exercised by Rysher unconditionally without need of further notice or documentation upon order of Series programs for the 2000/2001 Production Year by a network or other licensee and Rysher's acceptance of such order, but in any event no later than May 25, 2000.  Rysher shall be obligated to exercise the Option if the average Nielsen rating for adults 20-64 in the 1999/2000 Broadcast Season is 5.0 or above.  Johnson shall receive $1,000,000 upon execution as a non-refundable advance against fees due hereunder for the 2000/2001 Production Year.  In the event the Option is not exercised, Johnson shall be entitled to retain the non-refundable advance as a termination fee.

2. Compensation:  Johnson and DJP shall receive pay or play compensation as follows:

Mar-13-80  04:03pm  From-PARAMOUNT NETWORK TV BUSINESS AFFAIRS   2138023700   T-012  P.04/11  F-133

Production Year 1999/2000:        $9,500,000 payable as follows:

(a)    $7,260,000 for actor and executive producer fees at a rate of $330,000 per episode for 22 episodes;

(b)    $500,000 with respect to the U.S.A. advance pursuant to Paragraph 4 below.

(c)    $540,000 with respect to Office Services pursuant to Paragraph 3(a) below, plus Office Space.

(d)    $450,000 with respect to Overhead Expenses pursuant to Paragraph 3(b) below.

(e)    $750,000 payable immediately as an advance against the CBS Penalty payments due pursuant to the Term Agreement.

Production Year 2000/2001        $9,000,000 payable as follows:

(a)    $7,480,000 for actor and executive producer fees at a rate of $340,000 per episode for 22 episodes.

(b)    $500,000 with respect to the U.S.A. advance pursuant to Paragraph 4 below.

(c)    $540,000 with respect to Office Services pursuant to Paragraph 3(a) below, plus Office Space.

(d)    $480,000 with respect to Overhead Expenses pursuant to Paragraph 3(b) below.

3. Overhead (which shall be a direct cost of production of the Series):

(a)    Office Space and Office Services. Pursuant to Paragraph 13 of the Term Agreement, DJP shall continue to be provided with first-class office space and furnishings ("Office Space") at 3400 Riverside Drive in Burbank, which DJP and Johnson acknowledge are sufficient to comfortably house DJP's operations. In addition, in the 1999/2000 and, if applicable, the 2000/2001 Production Year, DJP shall continue to be provided with telephones, facsimile, photocopying equipment and supplies, reasonable messenger and mail services, and other customary office services resulting in expenses of Five Hundred Forty Thousand Dollars ($540,000) per year

2

Mar-19-03 08:04pm From-PARAMOUNT NETWORK TV BUSINESS AFFAIRS 3139523700 T-642 P.05/11 F-133

("Office Services"). Rysher shall promptly reimburse DJP for such Office Services upon DJP's submission of reasonably appropriate receipts or DJP's request for such funds.

(b) Overhead Expenses: In addition to the Office Space and Office Services, DJP shall be provided with the following amounts per Production Year in overhead expenses ("Overhead Expenses"):

| | |
|---|---|
| 1999/2000: | $450,000 |
| 2000/2001: | $480,000 |

All Overhead Expenses payable hereunder shall be a direct cost of production of the Series. Overhead Expenses shall be allocated and payable upon submission of reasonably appropriate receipts, or if Johnson requests, such expenses shall be paid in a lump sum without receipts but in no event sooner than the equivalent of 1/22 per episode produced.

4. USA Bonus.

(a) Rysher and USA Networks ("USA") have entered into an agreement dated as of April 1, 1998, pursuant to which Rysher has granted USA a limited license to exhibit Series episodes (the "USA Agreement"). Pursuant to the terms of the USA Agreement, the license fee payable to Rysher by USA shall be calculated each calendar quarter based on a formula which takes into consideration the average Nielsen rating which all Series episodes received in connection with their exhibition on a strip basis over the USA Network during such quarter. DJP shall be entitled to a one-time bonus payment ("USA Bonus Payment") each time USA's per-episode license fee increases as provided for in the USA Agreement. DJP shall not be entitled to more than one bonus at each license fee level (i.e., even if the per-episode license fee fluctuates so that the $800,000 level is reached twice during the term of the USA Agreement, DJP shall only be entitled to one bonus payment). The USA Bonus payments shall be triggered by the following increases in the USA per-episode license fee:

| Per-Episode License Fee | Bonus Payable to DJP |
|---|---|
| $850,000 per episode | $750,000 |
| $900,000 per episode | $750,000 |
| $600,000 per episode | $750,000 |
| $700,000 per episode | $750,000 |
| $750,000 per episode | $750,000 |

In no event shall the total of all bonus payments made to DJP hereunder exceed a total of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000). The advance against the USA Bonus provided for in Paragraph 4.b., below, shall apply

3

Mar-13-00  06:04pm   From-PARAMOUNT NETWORK TV BUSINESS AFFAIRS   2136623700   T-402  P.06/11  F-166

against USA Bonus payments due DJP hereunder. Each bonus payment shall be payable within thirty (30) days of Rysher's receipt of the applicable license fee from USA.

(b)  Commencing with the 1999/2000 Production Year, DJP shall be entitled to a non-refundable advance against the USA Bonus in the amount of Five Hundred Thousand ($500,000) for the 1999/2000 Production Year and $500,000 for the 2000/2001 Production Year payable on January 1st of each Production Year. The total advance pursuant to this sub-paragraph shall be One Million Dollars ($1,000,000).

5. Forgiveness of Debt: The parties acknowledge that (i) pursuant to Paragraphs 6.C and 7 of the Second Amendment, DJP currently owes Rysher the sum of Four Hundred Fifty-Five Thousand Five Hundred Thirty-Three Dollars ($455,533), and (ii) that pursuant to Paragraph 6.B of the Second Amendment, Rysher currently owes DJP the sum of Three Hundred Ninety-Five Thousand Dollars ($395,000). In consideration of the promises and mutual covenants contained herein, both parties waive their respective rights to collect such amounts.

6. Production Costs/Production Commitment: Rysher shall continue to be responsible for all production costs in connection with the Series as provided for in Paragraph II 5 of the Term Agreement. However, the direct production costs of the Series in the 1999/2000 and 2000/2001, if applicable, Production Years (inclusive of the Rysher Overhead Fee) shall be no less than Two Million Four Hundred Seventy-Five Thousand Dollars ($2,475,000) per sixty minute episode ("Pattern Budget"). The Pattern Budget shall include all executive producer and other producing fees.

7. Arbitration: The following shall replace Paragraph 6 C of the Second Amendment:

In each of the 1999/2000 and 2000/2001 Production Years, if applicable, respectively, if Johnson engages in material unreasonable conduct within his control (which such conduct, if curable, Johnson does not cure following notice thereof from Rysher, and a reasonable opportunity to do so taking into account the exigencies of production) and which actually and directly causes the cost to produce any particular episode during the 1999/2000 or the 2000/2001 Production Years, to exceed what the cost otherwise would have been to produce the particular episode as established by Rysher in good faith, then, in addition to whatever other remedies Rysher may have at law and in equity, Rysher shall be entitled to deduct an amount equal to the amounts which are actually paid by Rysher (i.e., by reason of Johnson's aforedescribed unbound, unreasonable conduct) in excess of what the cost would have been to produce the episodes of the Series during the applicable Production Year ("Excess Payments"), which are not reimbursed by insurance, from the Overhead Expenses. Rysher acknowledges that there are no Excess Payments for the 1999/2000 Production

4

Mar-13-00  16:05pm   From-PARAMOUNT NETWORK TV BUSINESS AFFAIRS   2139523798   T-042  P.07/11  F-123

Year as of March 2, 2000.  Within ten (10) business days after the end of each quarter during the 1999/2000, and, if applicable, the 2000/2001 Production Years, respectively, Rysher shall provide Johnson with a detailed accounting of all Excess Payments made by Rysher in such quarter.  Failure to do so shall be deemed a waiver of Rysher's right to seek a contribution from DJP with respect thereto.  In the event DJP desires to contest any reduction by Rysher of the Overhead Expenses by virtue of Excess Payments pursuant to this Paragraph, then within thirty (30) days after the completion of production of the last episode of each Production Year, DJP shall submit such dispute to arbitration pursuant to a single, mutually approved arbitrator with applicable experience in the entertainment industry.  Each party shall bear its own costs in connection with the arbitration.  If the parties cannot mutually agree upon a single arbitrator, then each party shall select its proposed arbitrator and the two proposed arbitrators shall as soon as practicable thereafter (but no later than two (2) business days) select the arbitrator who shall actually preside over such arbitration.

8.Intentional deletion.  Paragraph 7 of the Second Amendment shall be deleted and paragraph 7 of the First Amendment and any similar provision shall continue to be deleted.

9.Underburdant Bonus: At the conclusion of the 1999/2000 and, if applicable, the 2000/2001 Production Year, respectively, after all production costs in the applicable Production Year have been finalized, DJP shall be entitled to Fifty Cents ($0.50) for every One Dollar ($1) for which the Series comes under Pattern Budget, after Rysher has averaged its production costs on a cross-collateralized basis for all episodes produced over such Production Year.  The parties acknowledge and agree that for the purposes of this Paragraph 9 only the Pattern Budget for the 1999/2000 Production Year is Two Million Four Hundred Seventy-Five Thousand Dollars ($2,475,000) per episode, and that the Pattern Budget for the 2001/2002 Production Year, if applicable, will be determined by Rysher in good faith at the beginning of that Production Year in consultation with DJP, but in any event no less than $2,475,000.

10.Paramount Housekeeping Deal: For a period of two (2) consecutive years following the completion of production of the last episode of the Series, Paramount shall provide Johnson with a "housekeeping" arrangement as that term is customarily defined in U.S. Television industry to include offices on the Paramount lot, supplies, overhead and personnel not to exceed Two Hundred Fifty Thousand Dollars ($250,000) per year.

11.Miscellaneous:

(a)   Except as expressly amended herein, the terms and conditions of the Term Agreement, as it has been amended by the First and Second Amendments, shall remain the same and are hereby ratified and affirmed.

5

AGREED TO AND ACCEPTED:

DON JOHNSON PRODUCTIONS, INC.
FED I.D.#:

By:
Its: President

RYSHER ENTERTAINMENT, INC.

By: Jeff _____
Its: Executive Vice-President

With respect to Paragraph 15 Only:
PARAMOUNT NETWORK TELEVISION

By:
J.R. _____, Vice President

05/20/02   TUE 11:27 FAX 310 8041   A G S & K LLP
06-13-2002  08:45am  From-                              +13108895320      T-732  P.001/002  F-724

# ALSCHULER GROSSMAN STEIN & KAHAN LLP
## ATTORNEYS AT LAW

SAMUEL E. PRYOR
ATTORNEY AT LAW
spryor@agsk.com
310-551-0178

OUR FILE NUMBER
11133-10196

May 16, 2002

BY FACSIMILE – (310) 309-5290

Frank Stewart, Esq.
Senior Vice President
Business & Legal Affairs
Rysher Entertainment
2425 Olympic Boulevard, Suite 6040 West
Santa Monica, California 90404

Re:    Don Johnson/Rysher Entertainment, Inc.

Dear Frank:

This letter will confirm our conversation on Wednesday, May 15th, in which you courteously agreed that Don Johnson's time in which to bring any action relating to the series "Nash Bridges" against Rysher Entertainment will be tolled from, at least, our conversation on Tuesday, May 14th until and unless you give us reasonable notice (30 days) rescinding this tolling agreement (the "tolling period").

You also mentioned that you would "work with me" if I requested a reasonable earlier date. I am informed there was a statement dated March 17, 1998. Accordingly, I would appreciate your agreeing that the tolling period begins on March 16, 2002.

Under this agreement, all statutorily prescribed periods of limitations (and the doctrine of laches to the extent based upon the time period being tolled pursuant to this agreement) will be tolled during the tolling period. The conduct of any party in entering into this agreement will not be used against any party for any purpose in any subsequent litigation except with respect to the tolling of the period of limitations and the doctrine of laches.

Under our agreement, the parties' legal and equitable positions, including any claims and defenses, will be identical to their positions as of May 15th or, if you agree, as of the earlier date of March 15, 2002.

2049 CENTURY PARK EAST · THIRTY-NINTH FLOOR · LOS ANGELES, CA 90067-3213
TELEPHONE: 310-277-1226   ·   www.agsk.com   ·   FACSIMILE: 310-552-6077

③

Ex B

Exhibit A, Page 58

06/18/02  TUE 11:31  FAX 610 ███ 0207    A U S A LLP                                         ☎008

08-19-2002  08:40pm  From-                              +18188088220   T-702  P.008/002  F-724

Frank Stewart
May 16, 2002
Page 2

Please let me know if this presents a problem – or if my letter does not accurately
reflect our agreement. If acceptable, please sign below where indicated. Thank you for your
courtesy and cooperation.

Very truly yours,

Samuel R. Pryor  (AFL)

I have read and agree to the contents of this letter.

Frank Stewart

SRP:kao

cc:    Thomas B. Collier, Esq.

1

PROOF OF SERVICE

2

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3

I am employed in the County of Los Angeles, State of California. I am over the
age of 18 and not a party to the within action; my business address is: 2029 Century

4

Park East, Suite 2400, Los Angeles, California 90067. On March 19, 2009, I served the
foregoing document(s) described as: **NOTICE OF REMOVAL OF ACTION**

5

**UNDER 28 U.S.C. § 1551(b)** on the interested party(ies) below, using the following

6

means:

7

Robert G. Krupka, Esq.                    *Attorneys for Plaintiff*
Mark C. Holscher, Esq.

8

R.C. Harlan, Esq.

9

Kirkland & Ellis LLP

10

777 South Figueroa Street
Los Angeles, California 90017

11

Telephone: 213.680.8400
Facsimile: 213.680.8500

12

13

☐ BY PERSONAL SERVICE  I delivered such envelope(s) by hand to the offices of the
addressee(s).

14

☒ BY UNITED STATES MAIL  I enclosed the documents in a sealed envelope or package

15

addressed to the respective address(es) of the party(ies) stated above and placed the
envelope(s) for collection and mailing, following our ordinary business practices. I am

16

readily familiar with the firm's practice of collection and processing correspondence for
mailing. On the same day that correspondence is placed for collection and mailing, it is

17

deposited in the ordinary course of business with the United States Postal Service, in a
sealed envelope with postage fully prepaid at Los Angeles, California.

18

☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this

19

court at whose direction the service was made.

20

Executed on March 19, 2009, at Los Angeles, California.

21

22

Jennifer Fukai
[Print Name of Person Executing Proof]                    [Signature]

23

24

25

26

27

28

Notice of Interested Parties

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  2029 Century Park East, Suite 2400, Los Angeles, California 90067.  On March 19, 2009, I served the foregoing document(s) described as:  **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1551(b)** on the interested party(ies) below, using the following means:

Robert G. Krupka, Esq.                        *Attorneys for Plaintiff*
Mark C. Holscher, Esq.
R.C. Harlan, Esq.
Kirkland & Ellis LLP
777  South Figueroa Street
Los Angeles, California 90017
Telephone:  213.680.8400
Facsimile:  213.680.8500

☐ BY PERSONAL SERVICE  I delivered such envelope(s) by hand to the offices of the addressee(s).

☒ BY UNITED STATES MAIL  I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Executed on March 19, 2009, at Los Angeles, California.

Jennifer Fukai
[Print Name of Person Executing Proof]         [Signature]

Notice of Interested Parties

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Margaret M. Morrow and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV09- 1906 MMM (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

CONFORMED

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS   (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| DON JOHNSON PRODUCTIONS, INC. | RYSHER ENTERTAINMENT, INC., QUALIA CAPITAL LLC; and 2929 ENTERTAINMENT, INC. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Robert G. Krupka<br>Mark C. Holscher<br>KIRKLAND & ELLIS LLP<br>777 South Figueroa Street<br>Los Angeles, CA 90017<br>213.680.8400 | Stephen R. Mick<br>Julia I. De Beers<br>Akin Gump Strauss Hauer & Feld LLP<br>2029 Century Park East, Suite 2400<br>Los Angeles, CA 90067<br>310.229.1000 |

**II.   BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III.   CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV.   ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V.   REQUESTED IN COMPLAINT:   JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI.   CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

Removal of a complaint based on a claim founded on a right arising entirely by virtue of copyright law.

**VII.   NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☒ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 190 Other Contract | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 195 Contract Product Liability | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 196 Franchise | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | REAL PROPERTY | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 245 Tort Product Liability | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 290 All Other Real Property | | | | ☐ 871 IRS - Third Party 26 USC 7609 |

**FOR OFFICE USE ONLY:**   Case Number:  **CV09-1906**

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                                CIVIL COVER SHEET                                Page 1 of 2
CCD-JS44

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).   IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  [X] No   [ ] Yes

If yes, list case number(s): _____

**VIII(b).   RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  [X] No   [ ] Yes

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   [ ]   A. Arise from the same or closely related transactions, happenings, or events; or

[ ]   B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]   C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]   D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ]   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ]   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles. | |

* **Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _Stephen Mick_          Date March 19, 2009

Stephen R. Mick

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

    I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is:  2029 Century Park East, Suite 2400, Los Angeles, California 90067.  On March 19, 2009, I served the foregoing document(s) described as:  **CIVIL COVER SHEET** on the interested party(ies) below, using the following means:

Robert G. Krupka, Esq.               *Attorneys for Plaintiff*
Mark C. Holscher, Esq.
R.C. Harlan, Esq.
Kirkland & Ellis LLP
777  South Figueroa Street
Los Angeles, California 90017
Telephone:  213.680.8400
Facsimile:   213.680.8500

☐ BY PERSONAL SERVICE  I delivered such envelope(s) by hand to the offices of the addressee(s).

☒ BY UNITED STATES MAIL  I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at Los Angeles, California.

☒ (FEDERAL)  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

    Executed on March 19, 2009 at Los Angeles, California.

Jennifer Fukai_____                                    
[Print Name of Person Executing Proof]              [Signature]